RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD COMPANY

v.

DEPARTMENT OF TAXATION.

Civ. A. No. 83–0752–R.

United States District Court,
E.D. Virginia,
Richmond Division.

June 14, 1984.

**210**

Douglas Davis, R. Kenneth Wheeler, William L.S. Rowe, Hunton & Williams, Richmond, Va., Urchie B. Ellis, Richmond, Va., for plaintiff.

Gerald L. Baliles, Atty. Gen., Kenneth W. Thorson, Sr. Asst. Atty. Gen., Barbara M. Rose, Asst. Atty. Gen., Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

Presently before the Court is defendant Department of Taxation, Commonwealth of Virginia's ripe motion for judgment on the pleadings, plaintiff Richmond, Fredericks-

burg & Potomac Railroad Company's motion for summary judgment, and defendant Department of Taxation's cross-motion for summary judgment. The motions have been thoroughly briefed and oral argument has been heard. The matter is, therefore, ripe for adjudication.

I

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are not in dispute.

Prior to 1979, railroads, unlike other commercial and industrial enterprises, were not subject to the Virginia corporate net income tax, but rather paid a gross transportation receipts franchise tax.[1] On 1 January 1979, railroads became subject to the Virginia corporate net income tax; the gross receipts tax was repealed.

In 1972, Virginia had revised its corporate income tax laws to conform them, in large measure, to the federal income tax laws. This "Conformity Act," Va.Code § 58–151.0111(h) (1974) (repealed as obsolete by 1981 Va.Acts Ch. 402), meant that when the railroads came under the corporate taxation scheme, they were essentially being taxed by the Commonwealth of Virginia as to their income in much the same fashion that they were being taxed, and had been taxed, by the federal government.

Virginia corporate taxable income is based on the corporation's federal taxable income with certain adjustments not at issue. As to the railroads, no subtractions from taxable income on account of gains or losses with respect to property the railroad had acquired prior to 1 January 1979 were permitted.

RF & P filed 1979 and 1980 Virginia income tax returns incorporating the following claims as to non-depreciable property:

> On its 1979 and 1980 Virginia income tax returns, RF & P claimed that it should

---

1. In its *Answer to the Complaint,* defendant Department of Taxation, at p. 2, notes that the history of taxation in the Commonwealth of Virginia has included income taxes on railroads before 1 January 1979, which is the most recent date upon which railroads became subject to a Virginia net income tax. These earlier income taxes, so-called, are not at issue.

not be taxed on gain realized from sales of non-depreciable property to the extent that the gain was attributable to increases in value prior to 1979, the year in which RF & P first became subject to Virginia income taxation.

Consistent with this position, RF & P deducted from its Virginia taxable income the portion of the gain from sales or exchanges of non-depreciable property determined by multiplying the total gain by a fraction, the denominator of which was the total holding period of the property by RF & P, and the numerator of which was the holding period of the property before 1979.

Complaint at 3.

Likewise, the RF & P in both its 1979 and 1980 tax returns, contrived a formula whereby gain realized on the sale or exchange of depreciable property would receive a deduction:

RF & P took a similar position with respect to gain realized on the sale or exchange of depreciable property. For example, in 1979 and 1980 RF & P received settlements for equipment casualties suffered while being operated on other railroads' lines. For federal tax purposes the casualties were treated as sales or exchanges, with gain being recognized to the extent the settlement amounts exceeded the assets' federal income tax basis. RF & P claimed that the portion of the settlements attributable to depreciation taken prior to 1979 on equipment whose casualties occurred during the current taxable year should be excluded from its Virginia taxable income.

Consistent with this position, RF & P reduced its 1979 and 1980 Virginia taxable income by depreciation claimed on each casualty equipment for federal tax purposes before January 1, 1979, the effective date of Virginia's net income tax on railroads. Stated another way, RF & P treated its equipment as having a Virginia tax basis equal to original cost less depreciation allowable for Virginia income tax purposes after 1978. Gain was reported for Virginia tax purposes only to the extent that a casualty settlement exceeded this Virginia tax basis of the casualty equipment.

*Id.* at 3–4.

On 21 April and 2 June of 1982 the Department of Taxation issued notices of assessment against the RF & P. These assessments were the result of the Department's refusal to allow the deductions claimed by RF & P on both non-depreciable and depreciable property.

The RF & P applied for relief from these assessments by filing a preliminary amended return for 1979. On 19 November 1982 the railroad timely filed with the Department of Taxation its formal amended Virginia income tax return, claiming a refund of $1,066,475.00.

On its amended return, the RF & P claimed a deduction on depreciable property equal to the amount it had claimed for such depreciable property on its federal tax returns for the tax years prior to 1979. In other words, whereas in its original return, the RF & P claimed item by item deductions for equipment lost through casualty, in its amended return the RF & P claimed all deductions for all depreciable property that it had claimed for federal tax returns prior to 1979.

On 20 September 1983, the Department in a letter denied RF & P's claim in its amended return for the claimed depreciation deduction. Similarly, the Department reiterated its denial of the deductions for both depreciable and nondepreciable property claimed in the original return. Finally, the Department continues to refuse to correct the income tax assessments of April and June of 1982, and refuses the refund claimed by the RF & P.

On 16 December 1983, the RF & P, having exhausted its administrative remedies in the State, and claiming that it had been wrongfully assessed Virginia income taxes by the Department of Taxation, Commonwealth of Virginia, sought in this Court declaratory and injunctive relief against the Department. Specifically, the RF & P claims that the Department of Taxation has violated 49 U.S.C. § 11503(b)(4) by impos-

ing a discriminatory tax upon common rail carriers in Virginia, including the RF & P.

## II

## ISSUES

The issues in this action are clearly drawn. The first is whether 49 U.S.C. § 11503(b)(4) permits this Court to grant relief only for discriminatory property taxes, or for discriminatory income taxes as well.

**2.** 49 U.S.C. § 11503(b) provides as follows:

The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title [49 U.S.C. §§ 10501 *et seq.*]

In accordance with Pub.L. No. 95–473, 92 Stat. 1466 (1978) Section 306 of the original Railroad Revitalization and Regulatory Reform Act of 1976 was moved from its original location at 49 U.S.C. § 26(c). Certain changes in language were made. The statute called for recodification of the Interstate Commerce Act and makes clear that the changes in language were not to affect the substance of Section 306. See also H. Rep. No. 1395, 95th Cong., 2d Sess., reprinted in 1978 U.S. Code Cong. & Ad. News 3009.

Therefore, this Court must conclude that the language of 49 U.S.C. § 11503(b)(4) "impose another tax" means the same as the language in the original Section 306, "impose any other tax."

But even this clarification of the terminology of the subsection in question does not really answer the issue of the reach of subsection (b)(4). It is entirely possible that the revisers, realizing that *any other* could lend itself to the kind of expansive reading argued for by plaintiff today, yet having no authority to effect substantive changes in the law, simply substituted

49 U.S.C. § 11503(b)(1)–(3) meticulously set forth property taxes which a State may not impose upon rail transportation property. 49 U.S.C. § 11503(b)(4) forbids the State to levy "another tax which discriminates against railroads." [2]

The jurisdictional issue is a two-pronged one raising the additional question of whether the United States District Court has the power to order the kind of relief claimed by RF & P: a refund of income taxes already paid.[3]

*another,* a word more precisely referring to taxes of the sort enumerated in subsections (b)(1) through (b)(3) than it would be apt to mean any other tax of whatever type. But this Court does not have the authority to speculate on the semantic proclivities of the revisers. Rather, we must attempt to ferret out what exactly the Congress meant by the statute as it is presented to us.

**3.** 49 U.S.C. § 11503(c) provides:

Notwithstanding Section 1341 of Title 28 [28 U.S.C. § 1341] and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this Section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed by State law. If the ratio of the assessed value of other commercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as the sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section—

(1) An assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction as to the true market value of all other commercial and industrial property; and

(2) The collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district.

The other issue is whether or not, assuming *arguendo*, the taxes to be within the intendment of the statute, the tax imposed upon the railroad by the Commonwealth of Virginia actually discriminates against railroads in a fashion to violate federal law.

## III

## JURISDICTION

DOES 49 U.S.C. § 11503(b)(4) PROHIBIT DISCRIMINATORY INCOME TAXES, OR IS IT LIMITED TO STATE PROPERTY TAXES OR TAXES ENACTED IN LIEU OF A DISCRIMINATORY PROPERTY TAX PROHIBITED UNDER 49 U.S.C. § 11503(b)(1), (2) or (3)?

The Court is of course aware that a motion to dismiss for lack of subject matter jurisdiction is very different from a motion to dismiss for failure to state a claim upon which relief can be granted. In *Associated Dry Goods v. EEOC,* 419 F.Supp. 814, 818 (E.D.Va.1976), this Court recognized this distinction. In language that is most apposite to the present case, we stated, "Defendant's assertion that the sections of federal law cited by plaintiff are not applicable to the instant case does not defeat jurisdiction, but rather contests whether the plaintiff has stated a cause of action." Since the claims arise under the laws of the United States, jurisdiction is attained by virtue of 28 U.S.C. § 1331. See for example *Burroughs Corporation v. Schlesinger, et al.,* 403 F.Supp. 633, 636 (E.D.Va.1975).

The question before this Court is whether or not it has the power to grant the relief requested by plaintiff, the answer to which hinges on whether the tax complained of by the railroad is one over which Congress gave the United States District Court jurisdiction. In other words, this Court has the requisite subject matter, *i.e.,* federal question, jurisdiction necessary for it to determine whether or not the tax at issue fits within the statutory scheme of prohibited discriminatory taxes set forth in 49 U.S.C. § 11503.

With that clarification in mind, we proceed to the question of whether or not 49 U.S.C. § 11503(b)(4) forbids a State to levy any tax which discriminates against railway carriers, or whether the subsection simply prohibits the State from enacting a taxation scheme which, although not among the precise property tax devices made unlawful by § 11503(b)(1)–(3), nevertheless, achieves the same interdicted result.

49 U.S.C. § 11503(b) sets forth acts which "unreasonably burden and discriminate against interstate commerce," and flatly forbids a State, its subdivision, the authorities acting for it or its subdivisions, to do *any* of them.

(1) The State may not assess rail transportation property at a value having a higher ratio to the true market value of such rail transportation property than the ratio borne by the assessed value of other commercial and industrial property in the same assessment jurisdiction to the true market value of such other commercial and industrial property. Stated simply, if the State, for tax purposes, assesses commercial and industrial property at a value twice that of its true market value, it may not at the same time assess transportation property, for tax purposes, at three times its true market value, two and one-half times its true market value, or even 2.00001 times its fair market value. Commercial, industrial, *and* rail transportation property are to be assessed at the same ratio of property value for tax purposes to true market value.

(2) Making "assurance double sure," Congress then forbade the State to levy or collect a tax on an assessment illegally made under clause (1).

(3) Nor may a State levy or collect an *ad valorem* property tax on rail transportation property at a tax rate exceeding the tax rate applicable to commercial and industrial property in the same assessment jurisdiction. In other words, if a State has assessed a piece of commercial or industrial property, for tax purposes, at $100,000 and imposes a tax of $.01 per hundred dollars,

it may not, having valued a piece of railroad transportation property at the same $100,000, tax that property at $.02 per hundred dollars of assessed valuation.

It is subsection (4) which is the nub of the controversy, because here the Congress forbad the State to "impose another tax that discriminates against a rail carrier." We must decide whether the phrase "another tax" should be read by the statutory rule of construction of *ejusdem generis*, to mean another tax of the same or similar sort specified by subsections (1) through (3); or whether the facially, at any rate, "plain meaning" of the phraseology itself should be extrapolated from the statute and read to mean any tax, of any sort, which discriminates against a railroad—be it sales tax, income tax, franchise tax, excess profits tax, windfall tax, or "another tax."

## IV

### LEGISLATIVE HISTORY

Because there has been sharp controversy between the parties as to the meaning of the legislative history of the Act, the Court has undertaken its own independent review.

In *Ogilvie v. State Board of Equalization*, 657 F.2d 204, 206, 207 (8th Cir.1981), we find useful background information as to the genesis of the Railroad Revitaliza-

tion and Regulatory Reform Act of 1976. The 86th Congress passed Senate Resolutions 29, 151, in 1959, and 244, in 1960, requesting a study of national transportation policy. In the preliminary draft report of this study presented during the 87th Congress was a portion concerning *ad valorem* property taxation of railroads:

The Association of American Railroads was requested to submit any pertinent information available on relative tax discrimination in the matter of State and local taxes. A Table was submitted by the Association of American Railroads ... showing the extent of overpayment of railroad *ad valorem* taxes resulting from the assessment of railroad property at a per cent of its value that is higher than the per cent which the assessment of other taxpayer property is to the value of such other property. This confirms the findings of this committee that there is a studied and deliberate practice of assessing railroad property at a proportion of full value substantially higher than other property subject to the same tax rates.

S.Rep. No. 445, 87th Cong., 1st Sess., 458 (1961).

After the report was submitted to the 86th Congress, bills were introduced in the 87th, 89th, 90th, 91st, 92nd, and 94th Congressional sessions dealing with this precise subject matter.[4]

---

**4.** See H.R. 7421, 87th Cong., 1st Sess. (1961); H.R. 4972, 89th Cong., 1st Sess. (1965); S. 927, 90th Cong., 1st Sess. (1967); S. 2289, 91st Cong., 1st Sess. (1969); S. 1891, 93rd Cong., 1st Sess. (1973); S. 2718, 94th Cong., 1st Sess. (1975).

Much has been made of the Eleventh Circuit's characterization of § 11503(b)(4) as an "afterthought." *Alabama Great Southern R. Co. v. Eagerton*, 663 F.2d 1036, 1041 (11th Cir.1981). Much has also been made of that Court's statement that the earlier bills did not contain anything like this subsection. Two comments are instructive. In the first place, the *Eagerton* court was quoting the brief of the appellees when it used the word "afterthought." In fact, the court stated specifically, "we cannot give such cavalier treatment to a formal act of Congress, or a part of it that seems clearly within the purpose and intendment of the law." *Id.* Second, *S.Rep.*, No. 92nd Cong., 2d Sess. sheds

light on the evolution of this legislation. The report states:

On January 30, 1970, the Senate passed a bill (S. 2289 in the 91st Congress) that had the same purpose as this measure [S. 3945.] The purpose of both these measures ["is to prohibit the long-standing practice of states and localities of discriminatory taxation of transportation property of common or contract carriers."]

Neither of these earlier Senate bills, it is true, had anything comparable to present subsection (b)(4). However, the Senate bill (S. 2718) that eventually became the 4–R Act included the provision at issue. Despite the addition of this subsection, the stated purpose of this particular portion of S. 2718 remained the same as evidenced by its title "prohibiting discriminatory tax treatment of transportation property."

We are not unmindful of the Supreme Court's statement in *Railroad Trainmen v. Baltimore &*

While the origins of the 4R Act are instructive, they do not have the utility that an examination of the actual Senate bill (S.2718) which eventually became the Act itself possesses. The Court finds the following to be pertinent to an understanding of the language of § 11503(b)(4).

The original bill, which became the Railroad Revitalization and Regulatory Reform Act of 1976, was introduced to the Senate on 1 December 1975 by Sen. Hartke. The Committee on Commerce, having considered the bill, recommended to the Senate that it pass. The purpose of the bill was "to improve the quality of rail services in the United States through regulatory reform, coordination of rail services and facilities, and rehabilitation and improvement financing, and for other purposes." S.Rep. No. 94–499, 94th Cong. 1st Sess. 1, 65, (1975) *reprinted in 1976 U.S.Code Cong. & Adm.News*, 14, 79–80.

Section 207, entitled "Prohibiting Discriminatory Tax Treatment of Transportation Property" stated:

This section amends Part I of the Interstate Commerce Act by adding a new section 27 which declares certain taxation activities to be an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. These activities are prohibited and it is made unlawful for any State, political subdivision, or entity acting on behalf of the State or subdivision to commit any of these acts.

Section 27(a)

(1) The assessment of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property bears

to the true market value of such property and the same assessment jurisdiction;

(2) The levy or collection of a tax on an assessment unlawful pursuant of (1);

(3) The levy or collection of an *ad valorem* property tax on transportation property at a tax rate higher than that generally applicable to commercial and industrial property in the same assessment jurisdiction; and

(4) The imposition of any other tax which results in the discriminatory treatment of any common or contract carrier subject to the Interstate Commerce Act.

This language from the Senate Report by its caption and content indicates the emphasis this section was to have. Moreover, it seems implausible that the Committee members would specify that "certain taxation activities" are "an unreasonable and unjust discrimination" against interstate commerce and then designate, as an act which discriminates, the act of discrimination itself. That is all that subsection (4) does in this context. We do not expect such tautology of the Congress. Moreover, it is noteworthy that the section in dispute here *was* a part of that original bill, not an afterthought.

During the ensuing debate on this bill, an amendment was introduced to require the Federal Government to pay all State taxes owed by railroads in reorganization. Senator Hartke, in speaking against the amendment, said:

I would like to point out one further aspect of this issue, and that is the inequity of having the States tax railroad rights-of-way at all. As most of my colleagues here realize, we would not have to pass the legislation before the Senate today if there had not been a rather

*O.R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 1391–92, 91 L.Ed. 1646 (1947) that "[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text." The Supreme Court, however, went on to say, "for interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." In the

case before this Court, the extensive briefing and the equally extensive oral argument have shown beyond peradventure that the phrase "another tax" is indeed ambiguous, a term whose meaning is in great doubt which must be resolved. Accordingly, the court feels quite confident in relying on the title of the subsection as a tool, among many, available to it to resolve this doubt.

significant imbalance in Federal assistance to the various modes of transportation over the past several decades. This inequity in treatment does not apply just to the Federal Government. The States tax rail rights-of-way with some recent exceptions, such as Connecticut. The motor carriers and water carriers, the chief competitors of the railroads, pay only user taxes, or in the case of water carriers, no tax for use. It seems to me that if the Senate is going to address the question of State taxation of rail rights-of-way, we should do so in a comprehensive way that gets at the kind of problems that led to these bankruptcies in the first place.

121 *Cong.Rec.* 38461 (1975).

It is well to keep in mind that Senator Hartke's comments were directed to the very Senate bill which already had as part of its language the prohibition against imposing "any other tax which results in the discriminatory treatment" of railroads. In other words, the bill's sponsor, despite this seemingly general language, when discussing the kind of tax problem which had caused the plight of the railroads focused on property taxes, *e.g.*, taxes on the railroads' rights-of-way.

On 12 December 1975, H.R. 10979 was reported by the Committee on Interstate and Foreign Commerce of the House of Representatives. In the debate on this bill, which was passed by the House on 18 December 1975 as an amendment to S. 2718, Rep. Skubitz, from Kansas, explained to the House the purport of various titles of the House Bill:

In title VI [discriminatory state taxes], we have tried to deal with the problem of discriminatory state taxes. Here, we provided that any constitutional provision or statute or practice by the States, or any subdivision of the State, which attempts to impose a higher rate of tax than the true market value of the rail property, would be considered a burden on interstate commerce and therefore unconstitutional. We have provided that the tax rate should be the same as that for other industrial property located in the area through the railroad passes.

121 *Cong.Rec.* 41341 (1975).

The report of the Committee on Interstate and Foreign Commerce was even more explicit as to the property tax orientation of Section 601, "Discriminatory State Taxation:"

Section 601 of the reported bill is designed to prohibit states and localities from imposing discriminatory taxes on the transportation property of railroads. It amends the Interstate Commerce Act by declaring unlawful the discriminatory assessment of such transportation property, the collection of taxes based on the discriminatory portion of any such assessment, the collection of taxes at a discriminatory rate, or the imposition of any other tax which results in discriminatory treatment of a carrier by railroad. The Federal courts are given jurisdiction to enforce these prohibitions.

H.R. Rep. No. 94-725, 94th Cong., 1st Sess. 76 (1975).

These excerpt from the House Committee Report contradicts plaintiff's contention that the pertinent legislative history focusing on the property tax nature of what became § 11503(b)(4) occurred prior to the inclusion of the seemingly general language of § 11503(b)(4). The Committee Report could not be clearer: the bill is designed to prohibit States and localities from imposing discriminatory taxes on railroads' transportation property. It then goes on to say that it is unlawful to levy a discriminatory assessment, to collect taxes based on such a discriminatory assessment, to collect taxes at a discriminatory rate, or to impose any other tax which results in discriminatory treatment. Specifically the Committee states that the subject section makes unlawful "the imposition of any other tax which discriminates against a common or contract carrier regulated by the Interstate Commerce Act (the so-called 'in lieu tax')." Id. at 77. This history weakens the argument that the Congress, in considering a tax which might be imposed

in lieu of a property tax could have been contemplating an income tax.

The Committee of Conference ordered a conference substitute to the bill, S. 2718 reported, and on 19 December 1975, this conference report was passed by both the Senate and the House of Representatives. The relevant section was entitled "Prohibiting Discriminatory Tax Treatment of Transportation Property" and the Senate Conference Committee reported as follows:

> The Senate bill made it unlawful for any State, political division, or entity acting on behalf of the State or subdivision to commit any of the following act [sic.]: (1) the assessment of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property bears to the true market value of such property in the same assessment jurisdiction; (2) the levy or collection of the tax on an assessment unlawful pursuant to (1); (3) the levy or collection of an *ad valorem* property tax on transportation property at a rate higher than that generally applicable to commercial and industrial property in the same assessment jurisdiction; and (4) the imposition of any other tax which results in the discriminatory treatment of any common or contract carrier subject to the Interstate Commerce Act.

S.Rep. No. 94–585, 94th Cong., 1st Sess. 138–39 (1975). The arrangement of the subsections suggests that they were covering various aspects of a common problem: discriminatory property taxes. A State may not either assess, levy or collect *ad valorem* property taxes at a rate higher than that applicable to industrial and commercial property. Nor may that State impose any other quasi-property tax resulting in discriminatory treatment akin to the discrimination wrought by the imposition of the forbidden *ad valorem* property taxes.

This reading of the conference report of the Senate bill is bolstered by the conferees' description of the House Amendment:

> Part I of the Interstate Commerce Act was amended to include a new section making unlawful *ad valorem* State or State subdivision taxation activities. Such prohibited tax practices included (1) over-valuation; (2) collection of an unlawful tax; (3) collection of any *ad valorem* property tax at a higher tax rate than the tax rate generally applicable to commercial and industrial property in the taxing district; or (4) the imposition of a discriminatory 'in lieu tax.'

*Id.* at 139.

The conferees read the House Amendment as prohibiting specifically *ad valorem* taxation activities, which by no stretch of the imagination could include income taxes. The conferees' use of the phrase "discriminatory in-lieu tax" bolsters this conclusion.[5]

The conference substitute, however, followed the Senate bill, "except that the conferees deleted the provision making this section inapplicable to any State which had, on the date of enactment, a constitutional provision for the reasonable classification of property for State purposes." *Id.* at 139. Once again the emphasis on the property taxation focus of the bill is manifest. States simply were not going to be permitted, regardless of how they might classify property, regardless of how reasonable that classification might be, to tax rail transportation property differently from the way in which States taxed other commercial or industrial property.

On 20 January 1976, the House of Representatives voted and on 21 January 1976, the Senate voted to pass H.Con.Res. 527, which vacated the Conference Report approved 19 December 1975 and recommitted the matter to the Committee of Conference.[6]

---

5.  *See also* H.R. Rep. 94–768, 94th Cong. 1st Sess. 138–39 (1975).

6.  This was an effort on the part of the Congress to make certain changes in the bill without which the President had indicated he would not sign. These changes are not germane to the provision being discussed.

On 23 January 1976, the Conference Committee submitted its report to the House of Representatives and to the Senate. The House Conference Report differed from the Senate Conference Report in that it provided a "Summary and Description" of each of the titles of the Act. H.R.Rep. No. 94–781, 94th Cong. 2nd Sess. Instructive is the Conference Committee's description of Title III, Subsection (6), which the Committee described as prohibiting "States and localities from imposing taxes at a discriminatory rate on the transportation property of railroads." *Id.* at 136.

Once again it must be borne in mind that this is a description attached to the bill containing the subsection at issue, a subsection which plaintiff is attempting to stretch to cover all forms of taxation. Such was not the understanding nor the intent of the House Conference Committee which reported this bill back to the House of Representatives.

With one significant exception, the language of the conferees' second report did not differ from that of the first report. The Committee described the second conference substitute as following the Senate bill:

> except that the conferees deleted the provision making this section inapplicable to any State which had, on the date of enactment, a constitutional provision for the reasonable classification of property for State purposes and *limited the provision to taxation of railroad property.* (Emphasis added).

*Id.* at 168.

In other words, the second Conference Committee Report stated what the first Conference Committee Report had implied.[7] The provision was limited to the taxation of railroad property—the expansive language, already present in the bill, of what became § 11503(b)(4) notwithstanding.

In the final debate on the bill, the comments of Rep. Devine of Ohio are probably the best summation of what this bill meant to the Congress that enacted it:

> Mr. Speaker, this bill also prohibits discriminatory taxation of railroad property. It is my understanding that some seventeen States tax railroad property on a different standard than other property. Some $50,000,000 to $60,000,000 should be realized by the railroad industry as a result of this provision.

122 *Cong.Rec.,* 1351 (1976).

This review of the legislative history shows that in the minds of the Congressmen who sponsored it, the members of the House and the Senators who debated it, the members of the Conference Committees who worked on it, and the members of Congress who passed it, that the thrust of what became 49 U.S.C. § 11503 was directed toward prohibiting discriminatory property taxation. The provision was not "thrown in as a catch-all." It was there at the time the bill was written about, discussed, edited, reported out, and passed. Its encompassing language was never appreciably altered, nor was its focus on property taxation ever blurred.

This review of legislative history of the bill also shows the converse. *Not once,* in all the committee reports, conference reports, comments, debates, explanatory notes, nor in any other element of the legislative history has there appeared one word, suggestion, or intimation, not one jot or tittle, that Congress intended the encompassing function the railroad has in mind for subsection (4). Argument is made that the *absence* of such a legislative history is not significant. Justice Stewart is quoted as saying that we cannot determine congressional intent on the theory of the dog that didn't bark.[8] Had Holmes (Sherlock, not Oliver Wendell) considered himself bound by that dictum he never would have deduced the murderer.[9] In a case such as

---

7. *See also* S.Rep. No. 94–595, 94th Cong. 2nd Sess. 166 (1976), reprinted in 1976 *U.S. Code Cong. & Adm. News,* 181.

8. *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980).

9. Doyle: *The Silver Blade.*

this, I cannot understand why a court should eschew *any* fact which might help deduce the intent of Congress. I find the non-barking dog significant.

■ Considering all the above, I conclude that the legislative history of the R–4 Act shows that § 11503(b)(4) was intended to cover those surrogate property taxes which a State might try to levy in defiance of § 11503(1) through (3) in order to achieve their objective of discriminating in their property tax structure against railroads.

## V

### CONSTRUCTION OF 49 U.S.C. § 11503

With the legislative history in mind, it is plain that the statute cannot logically be read as the plaintiffs wish. Indeed, the legislative history is clearly reflected in the structure of the statute. Over a period of some years, the Congress became increasingly troubled by the deteriorating condition of the American railroad industry. A portion of that legislative concern was directed toward the discriminatory property taxes levied upon railroads by States and their taxing subdivisions. The Congress studied the problem at some length, eventually enacting the 4–R Act, which prohibited such discriminatory property tax in what became 49 U.S.C. § 11503.

The Congress having devoted such care, attention, and thought to the problem and to its solution, it makes no sense, either historically or logically, to assume that it meticulously crafted 49 U.S.C. § 11503(b)(1) through (3) in surgically precise terms only to overthrow that entire effort by 49 U.S.C. § 11503(b)(4), which renders subsections (b)(1) through (3) useless verbiage. Given plaintiff's expansive reading, subsection (b)(4) would encompass all forms of taxation against railroads whose effect was "discriminatory," thus rendering the legislative history and the careful drafting of subsections (b)(1) through (3) nugatory.

Moreover, 49 U.S.C. § 11503(c) would be totally at variance with § 11503(b) if plaintiff's reading of the statute were to prevail. Plaintiff disregards not only the narrowness of the property taxation evils sought to be redressed and specifically spelled out in the statute, it ignores as well the fact that the relief afforded is scrupulously tailored to address those very types of property tax discrimination. Plaintiff would have us excerpt 49 U.S.C. § 11503(b)(4), ignore the remainder of the statute, and simply accept that no taxing authority may discriminate, in any way whatever, against railroads. And then, consonant with this view, plaintiff would have us agree that notwithstanding clear and explicit restrictions on a district court's power to fashion relief under § 11503(c), the district court can give whatever equitable relief might be appropriate for remedying whatever kind of discrimination might exist.

I cannot thus completely read out of existence explicit statutory provisions. Not only would such a practice be senseless, it represents an effort by a court to make a statute say what that court wants it to say, what the court thinks the Congress ought to have said, or what the court simply believes ought to be the law. This is not the role of the judiciary.

I am supported in this strict reading of the statute by the initial language of 49 U.S.C. § 11503(c), "notwithstanding Section 1341 of Title 28 . . . ." The Tax Anti-Injunction Act provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

■ So pervasive is the policy behind this Act, *i.e.*, that the federal government should exercise no right or authority to interfere in the tax collection of an independent sovereign, exceptions to this Act must be read narrowly. The strength of the policy behind this Act has been articulated by the Supreme Court thrice, recently. In *Tully v. Griffin, Inc.*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976), the court spoke of the origins of the Act:

[T]he statute has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administer its own fiscal operations.

Courts have been loath to carve out exceptions to this Act, even in the face, for example, of the 42 U.S.C. § 1983 grant of power to a federal court to enjoin unconstitutional State practices. In *Fair Assessment in Real Estate v. McNary*, 454 U.S. 100, 116, 102 S.Ct. 177, 186, 70 L.Ed.2d 271 (1981) the Supreme Court held that the principle of comity barred taxpayers' damages action brought in federal courts under 42 U.S.C. § 1983 to redress the allegedly unconstitutional administration of estate tax system.

After having examined in detail the history of the immediacy of federal relief available under § 1983, the court nevertheless held:

[D]espite the ready access to federal courts provided by [*Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)] and its progeny, we hold that taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts.

To be sure, 49 U.S.C. § 11503(c) specifies in terms that regardless of the Tax Anti-Injunction Act, the district court may afford a plaintiff the relief specified. But analogically, if the Supreme Court has held that so important and expansive a right as that of the § 1983 access to federal court to challenge a State's unconstitutional practices, must yield to the supremacy of the Tax Anti-Injunction Act, then any exception to that Act, even a statutory one, must be construed narrowly, not expansively.

As the Supreme Court stated in *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 522, 101 S.Ct. 1221, 1223, 67 L.Ed.2d 464, *reh. den.*, 451 U.S. 1011, 101 S.Ct. 2349, 68 L.Ed.2d 864 (1981):

[T]his legislation [28 U.S.C. § 1341] was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes. 81 Cong., Rec. 1415 (1937) (remarks of Sen. Bone).

■ The relief which a district court is permitted to give under 49 U.S.C. § 11503(c), as written, is an appropriately narrow exception to the Tax Anti-Injunction Act. It cannot be given the expansive reading argued for by plaintiff without doing violence to its restrictive language, to long-standing congressional concern, and to authoritative and recent judicial interpretation. No relief is prescribed in 49 U.S.C. § 11503(c) even remotely appropriate to redress allegedly discriminatory income taxes. This omission persuades me even more strongly, that discriminatory income taxes were never intended to be reached by this statute.

By "structure of the statute" I mean its form and content. To review: Section (b)(1), (2), and (3) sets forth and condemns certain specific strategems used by States and localities to obtain from railroads more than their "fair share" of property tax revenue. Section (c) then empowers the courts in certain defined situations to enjoin such property tax inequities. The language of Section (c) precludes power to do more than correct the evil apprehended in Section (b)(1), (2), and (3). In the very midst of this carefully drawn, limited, and consistent statute, a statute dealing with a sensitive area of federal relationships, appears subsection (b)(4).

On its face subsection (4) totally and completely destroys the structure and content of the statute. All that comes before and all that comes after is shattered into meaninglessness. The words no longer have a function. The enforcement section, (c), offers no power to remedy a subsection (4) offense; subsections (1), (2), and (3), in all their careful detail, are rendered as useless as a hobby horse in a cavalry charge.

It is because all the courts and all the litigants have sensed this internal contradiction that the question of congressional intent has repeatedly been raised in litiga-

tion. To simply look at the language of subsection (4) and say "It means what it says," requires tunnel vision. A mere flick of the eye over the rest of the statute reveals that it couldn't mean what it says, unless Congress is a fool. I don't think Congress is a fool. At the least there should be a rule of statutory construction that Congress is presumed not to be a fool.

## VI

### CASE LAW

The parties have, of course, argued the cases which construe § 11503, with the plaintiff arguing their number and consistency must, if not control, at least strongly persuade this Court that 49 U.S.C. § 11503(b)(4) must be read to forbid a State's imposing any "discriminatory" tax of any nature upon a railroad.

Defendant counters by arguing that the case upon which plaintiff, and most of the other decisions rely, *Alabama Great Southern R. Co. v. Eagerton*, 663 F.2d 1036 (11th Cir.1981), itself rests on a misapprehension of the narrowness of an earlier case, *Ogilvie v. State Board of Equalization*, 657 F.2d 204 (8th Cir.1981). Defendant further argues that *Eagerton* being wrong, all cases that rely on *Eagerton* must themselves also be wrongly decided.

Plaintiff responds with the challenge that the Eighth Circuit, which decided *Ogilvie*, subsequently affirmed the expansive reading it had given to the provision. It is in the context of this dispute, that we must examine the actual cases which have construed § 11503 broadly.

In *Ogilvie v. State Board of Equalization*, 657 F.2d 204, 210 (8th Cir.1981) the Court of Appeals addressed the issue of whether personal property and trade fixtures could be included in the assessed value of railroad property while similar personal property of locally assessed businesses was exempt from *ad valorem* property taxation. The Court upheld, and incorporated into its opinion, the finding of the district court:

The intent of Congress is enacting § 306 [49 U.S.C. § 11503] was to protect interstate rail carriers from discriminatory property taxation. The most obvious form of tax discrimination is to impose a tax on a class of rail transportation property that is not imposed on other nonrailroad property of the same class. The inclusion of personal property in the assessed value of railroad property and other centrally assessed businesses imposes a personal property tax on centrally assessed businesses that is not imposed on locally assessed businesses.

Therefore, the Court of Appeals' subsequent statement, "[a]s noted in our review of the history of this Section, its purpose was to prevent tax discrimination against railroads in any form whatsoever," must be read in the context of the previously quoted paragraph which deals specifically, and wholly, with a property tax. *Id.* The statement cannot be lifted out of context to support the proposition that the *Ogilvie* court construed 49 U.S.C. § 11503(b)(4), as a holding, to include all discriminatory taxes imposed by the State.

In *Alabama Great Southern Railroad Co. v. Eagerton*, 663 F.2d 1036, 1040 (11th Cir.1981), at issue was a railroad licensing tax imposed by the State of Alabama. The railroads asserted that collection of such a license tax was prohibited by 49 U.S.C. § 11503(b)(4). While the Eleventh Circuit gave due consideration to the support which the legislative history offers for a narrow reading of the subsection, it held squarely:

It would be difficult to imagine statutory language that would be less needful of construction than the 'any other' language used here.... Without invoking any of the ordinary rules of construction, it would appear that subsection (b)(4) is indeed intended as a catch-all provision to prevent discriminatory taxation of a railroad carrier by any means.

The Court then went on to quote, out of context, the *Ogilvie* court's statement that the purpose of the 4–R Act was to prevent

tax discrimination against railroads "in any form whatsoever." *Id.*

Plaintiff seeks to recoup the argument by pointing out that the Eighth Circuit, so to speak, clarified itself in *Trailer Train Co. v. State Board of Equalization*, 710 F.2d 468, 472 n. 6 (8th Cir.1983). This decision addressed the question of whether or not North Dakota's *ad valorem* tax of railroads' personal property, while exempting the personal property of commercial and industrial taxpayers was proscribed by 49 U.S.C. § 11503(b)(4). Agreeing with the *Eagerton* court, the Eighth Circuit concluded that the contrasting use of the language "transportation property" in subdivisions (b)(1) through (3), together with the juxtaposition of "any other tax" and "common carrier by railroad" in subdivision (b)(4) broadened, rather than narrowed, the scope of (b)(4) by making it applicable to all forms of State taxation not just property taxation.

This reading of the statute is supported only by a selective reading of its legislative history. The *Trailer Train* court, for instance, referred to S.Rep. No. 94–499, 94th Cong. 1st Sess. 1–8 (1975), as indicating the congressional will to "revitalize all parts of the railroad industry." *Id.* at 472. When looked at in their entirety, it is true that the nine titles of the Act have purposes far beyond redressing inequitable property tax treatment, *viz.*, the reorganization of bankrupt railroads, the establishment of the so-called Northeast Corridor, to name only two. To take the expansive purposes of the entire Act and attempt to see in these a justification for a broader reading of one specific statutory subsection than Congress, from its reports and debates on that section intended, is to give the words meaning which Congress did not intend.

Plaintiff also calls the Court's attention to four other decisions which have construed § 11503(b)(4).

In *Atchison Topeka & Santa Fe Railway v. Bair*, 535 F.Supp. 68, 70 (S.D.Iowa 1982), the court considered an excise tax levied upon railroads by the State of Iowa. It agreed with plaintiffs' reading of the statute that "another tax encompasses not only property taxes, but also excise taxes, such as the one challenged herein," but added nothing new to the *Eagerton* court's analysis. Indeed, the district court stated at p. 71:

> Following a well-reasoned discussion, the Eleventh Circuit concluded that the phrase 'any other tax' was not limited to property taxes, but encompassed discriminatory nonproperty taxes, as well.

> The Court agrees with the Eleventh Circuit's conclusion and is of the opinion that the same analysis applies to 49 U.S.C. § 11503(b)(4)'s 'another tax' language.

Plaintiff would have us conclude that because the Court in Eagerton relying on *Ogilvie*, read the statutory language expansively, and that this expansive reading was adopted across the board by the *Trailer Train* and the *Atchison, Topeka & Santa Fe* courts, the reasoning itself gains in persuasiveness. Viewed in the light of the legislative history and the statute's structure, persistence simply does not add up to correctness. The congressional intent as applied to the language must be the polar star by which we reason.

A similar example of a district court simply adopting the reasoning of *Eagerton is Kansas City Southern Ry. Co. v. McNamara*, 563 F.Supp. 199, 200 (M.D.La.1983). The issue presented to the Court was whether it had jurisdiction to hear the action because the Louisiana statute levied a license tax rather than an *ad valorem* or property tax. Considering 49 U.S.C. § 11503(b)(4), the district court acknowledged that the issue had been squarely presented to the Eleventh Circuit in *Eagerton*, which reversed the district court by holding that the Act reaches all manner of taxes upon railroads. The district judge thereupon observed in *Kansas City:*

> A federal district court having uniformity in mind, should follow decisions by circuit courts even when those decisions are not binding precedent in the circuit where the district court sits, unless clear

and compelling reasons exist for declining to do so.

Unlike that district court, I believe that such compelling reason does exist. The Eleventh Circuit, I respectfully believe, failed to read the legislative history of the Act properly; indeed, it can hardly be said the Eleventh Circuit relied on the legislative history at all; instead it contended that the plain meaning of the statute was so obvious no reading of its history was really necessary. The nonsense of meticulously listing the property tax schemes listed in subsections (1), (2), and (3) as illegal only to swallow them up in the encompassing language of subsection (4) leads me to believe that there is less to (4) than meets the eye. The legislative history confirms this view.

In *Chesapeake & Ohio v. Rose*, Memorandum Order No. 82–2564 (S.D.W.Va. August 22, 1983), the Court looked at business taxes imposed on the railroads by the State of West Virginia. As to the scope of 49 U.S.C. § 11503(b)(4), the Court stated,

> Defendants' contention that the scope of Section 306 [49 U.S.C. § 11503] is limited to property taxes or taxes in lieu of property taxes and accordingly does not reach the taxes at issue here is not untenable, but was not supported by the holdings of those courts of appeals which have addressed themselves to this issue.

Slip Op. at 11–12.

In other words, the district court acknowledged the logic of confining the scope of 42 U.S.C. § 11503 to property taxes but was dissuaded from applying that logic by the holdings in *Alabama Great Southern Railroad v. Eagerton*, 663 F.2d 1036 (11th Cir.1981), and, by extension, by *Ogilvie v. State Board of Equalization of the State of North Dakota*, 657 F.2d 204 (8th Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981). The acceptance of the *Eagerton* reading, without independent reasoning, does not add to *Eagerton's* weight.

In *Atchison, Topeka, and Santa Fe Railway Co. v. Bair*, 338 N.W.2d 338, (Iowa 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984), the Supreme Court of Iowa construed 49 U.S.C. § 11503 with respect to an Iowa tax on fuel consumption by railway vehicles; the court held that such a tax was invalid under 49 U.S.C. § 11503(b)(4).[10] The Iowa court stated, "We are unable to read Congress' words 'any other tax' to mean 'any other property tax,'" and supported that conclusion with *Eagerton, Ogilvie,* and *Trailer Train Co., Id.,* at 344.

Relying as they do on the *Eagerton* court's reasoning, the flaw in all these decisions is the same: a misreading or a non-reading of the legislative history.

The 94th Congress did not design subsection (b)(4) as a "catch-all" or as an "afterthought." What evolved into 49 U.S.C. § 11503(b)(4) underlay all the congressional deliberation from the moment that the two bills were introduced into the Senate and the House. This Court's examination of the legislative history of those two bills shows, clearly I think, that *with the provision in place*, the intent of the Congress was to relieve railroads from discriminatory property taxes.

The case law cited by plaintiff, then, does not persuade the Court that it should alter its conclusion that 49 U.S.C. § 11503(b)(4) necessarily is restricted to the imposition of

---

**10.** The Iowa Supreme Court stated at p. 344, "[W]hen the Senate and House developed separate bills, subsection (d) [subsection (b)(4)] was added in conference committee. *Alabama Great Southern Railroad v. Eagerton,* 663 F.2d 1036, 1040–41 (11th Cir.1981)." This statement involves a misreading by both the *Eagerton* court and the Supreme Court of Iowa.

It is true that the 91st Congress debated a predecessor bill, which did not contain the equivalent of subsection (b)(4). However, as we have seen from examination of the legislative history, the original Senate Bill 2781, which became the 4–R Act, had the equivalent of subsection (b)(4) from the very outset. Likewise, H.R. Bill 10789 had its own "any other tax" provision. While the conference committee amalgamated the language of these two sections, ultimately preferring that of the Senate Bill, it is totally incorrect to say that the essence of subsection (b)(4) was added in a conference committee. It had been present in one form or another from the very outset of the 94th Congress' consideration of the railroad legislation.

any other discriminatory property tax and that, therefore, the Virginia corporate income tax, whose application plaintiff claims is discriminatory as to railroads, is not properly a tax over which this Court has the authority to grant plaintiff relief under the statute.

### VII

### REFUND CLAIM (49 U.S.C. § 11503(c))

■ Having concluded that the reach of § 11503 is limited to property taxes, we do not need to address the question of whether this Court, in appropriate cases, has the authority to grant the refund relief requested by plaintiff, but we will do so in the interests of thoroughness. We would note initially the holding of the district court in *Atchison, Topeka & Santa Fe Railroad Co. v. Lennen*, 531 F.Supp. 220, 236 (D.Kan.1981):

> Before this Court could find that a cause of action for retrospective relief is sufficiently stated, we would have to find either an express or implied grant of jurisdiction by Congress to the federal courts to provide such relief. We find no such grant in either the language or purpose of the 4–R Act.

In *Trailer Train Co. v. State Board of Equalization*, 697 F.2d 860, 865–66 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139, the Court of Appeals upheld the district court's decision that 49 U.S.C. § 11503(c) permits the district court to enjoin tax-rate discrimination independent of any assessment-ratio discrimination. The Court's discussion of the interplay between subsections (b) and (c) of § 11503 is instructive:

> Whether a district court has jurisdiction under Section 11503 to enjoin the use of a discriminatory tax-rate presents a sticky exercise in statutory interpretation. Subsection (b) of Section 11503 prohibits, among other things, the discriminatory assessment of rail-transportation property and the levy or collection of a tax based on discriminatory tax rates. The first sentence of subsection (c) then grants the district court jurisdiction to

prevent a violation of subsection (b). But the second sentence of subsection (c) provides that '[r]elief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least five per cent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction.' Under a narrow, literal reading of § 11503, it would appear that, while tax-rate discrimination constitutes a violation of the statute, injunctive relief can only be granted if the tax-rate discrimination is accompanied by an assessment-ratio discrimination of at least five per cent. A statute, however, should not be interpreted so narrowly as to defeat its obvious intent.

> .... Given the basic concerns motivating Congress' enactment of Section 11503, Congress could not have intended that the statute be construed as authorizing the district court to enjoin a tax-rate discrimination only when it is accompanied by an assessment-ratio discrimination. Such a literal reading of § 11503 ignores Congress' recognition that discriminatory taxation of carriers can result from *either* assessment-ratio or tax-rate discrimination. It also undermines Congress' intent to provide discrimination victims with an injunctive federal-court remedy by placing arbitrary limits on those who could apply for such relief. The literal reading of Section 11503 leads to the absurd result that a district court could enjoin the use of an assessment-ratio excessive by six per cent, but would be powerless to enjoin the use of a tax-rate excessive by eighty per cent unless it were also accompanied by the use of an excessive assessment-ratio.

We are in agreement with the emphasis of the *Trailer Train Co.* court on the illogic of the State's argument in that case. We also agree, however, with the *Lennen* court's emphasis on the prospective nature of that relief. There could well be situations where to prevent an on-going viola-

tion of the statute it might be necessary that a court order a refund. This is a far cry from saying, as plaintiff would wish us to say, that because the relief which a district court can grant is somewhat broader than might at first blush appear from a literal reading of the statute, a district court can grant the refund of discriminatory income tax. In other words, § 11503(c) can never be read so expansively as to justify relief from a tax not included within § 11503(b).

## VIII

## DOES THE VIRGINIA CORPORATE INCOME TAX AS APPLIED TO PLAINTIFF DISCRIMINATE AGAINST IT?

█ Having found that the tax in question is not within the purview of 49 U.S.C. § 11503(b)(4), we properly need not reach the question of whether or not that tax does, in fact, discriminate against the RF & P. We do so, however, and find that the tax does not discriminate.

Effective for the taxable years beginning on or after 1 January 1974, Virginia amended its income tax laws to conform to the federal income tax laws, in part, by adopting the definition of "federal taxable income." This legislation, the "Conformity Act", permitted corporate taxpayers to reduce their 1972 Virginia taxable income by:

> That amount, if any, of which the adjusted basis of depreciable property determined for Virginia income tax purposes ... exceeds · the adjusted basis of the same property for federal income tax purposes determined at the close of the same period.

Va.Code § 58–151.0111(h) (1974) (repealed as obsolete by Va.Acts Ch. 402). The purpose of this modification was to assure that commercial and industrial taxpayers thereby received a Virginia tax benefit for all prior depreciation allowed or allowable for federal income tax purposes but not previously allowed for Virginia income tax purposes.

This Extra Depreciation Deduction permitted such a large amount to be deducted that this transitional modification was extended to permit a three-year carryover of the unused portion of the Extra Depreciation Deduction, with the effect that some commercial and industrial taxpayers not only escaped the 1972 Virginia net income tax altogether, but were able to either eliminate or to reduce their Virginia net income taxes for up to three subsequent years.

Unlike industrial and commercial taxpayers at large, from 1 January 1903 through 31 December 1978, Virginia railroads were subject not to a corporate income tax but to a franchise tax measured by their gross transportation receipts. Under this taxation scheme, railroads were permitted no deductions for losses and expenses; *i.e.,* neither RF & P nor any other Virginia railroad could reduce its taxable receipts by the amount of any depreciation. Effective 1 January 1979, the Virginia General Assembly brought railroads under the Virginia corporate net income tax.[11]

As to its depreciable assets, RF & P has taken the position that it too should be entitled to a similar transitional deduction to the one accorded industrial and commercial taxpayers when, for the first time, they were placed under the Conformity Act. Specifically, RF & P points out that when an ordinary taxpayer claims depreciation, the amount claimed is deducted from his otherwise taxable income. In order to "recapture" this untaxed income, when the asset is sold, gain is taxed as the difference between the selling price and the adjusted basis of the taxpayer in the asset (cost minus depreciation).

RF & P contends that Virginia's refusal to allow it a similar Extra Depreciation Deduction is discriminatory. In particular, RF & P argues, that during the years that

---

**11.** Both parties argue the question of whether the General Assembly did so in response to Congress' passage of the 4–R Act. That the General Assembly was motivated by the 4–R Act does not mean that the gross receipts tax was necessarily discriminatory nor can this action be made to stand for the proposition that the Department of Taxation is on less than solid ground in presently asserting that § 11503(b)(4) addresses only property taxes.

RF & P and other railroads were paying the gross receipts franchise tax, they were never allowed the benefit of depreciating the value of the property they owned. Now, however, upon the sale of such property, they are being forced to pay tax on the difference between the cost of that property *minus* a depreciation they were never allowed, and the selling price. This they claim is discriminatory as to railroads. Also allegedly discriminatory is the Department's refusal to allow the Railroad to ignore that portion of gain accruing before 1979 upon non-depreciable property.

RF & P has, throughout, attempted to place itself in the position of an industrial or commercial taxpayer granted certain tax benefits by Virginia to equalize the tax burden which fell upon such commercial and industrial taxpayers when Virginia conformed its income tax to the federal tax structure.

The Department of Taxation has, with equal consistency, taken the position that the RF & P has not been discriminatorily treated. The Department argues that the railroad is in the position of a newcomer to the corporate income tax structure, similar to a corporation recently organized, or a foreign corporation moving to Virginia for the first time. Such taxpayers must simply take Virginia's tax structure—conformity and all—as they find it. The resolution of these inconsistent positions depends upon analysis of the class of taxpayer to which all Virginia railroads are to be compared.

First of all the distinction allegedly burdening the railroads is discriminatory only if railroads, *qua* railroads, are treated differently from same or similarly situated taxpayers. It is here that the sharpest disagreement between the Department of Taxation and RF & P has occurred. The Department contends that those taxpayers similarly situated to the railroads are commercial and industrial taxpayers joining the Virginia corporate income tax structure not upon passage but some time after the passage of the Conformity Act. The railroad, on the other hand, focuses on those commercial and industrial taxpayers who received the Extra Depreciation Deduction at the time the Conformity Act was passed.

This argument can be resolved by noting the fact that the railroads cannot be compared to those commercial and industrial taxpayers who received the Extra Depreciation Deduction because, unlike such corporate taxpayers, the railroads had never been subjected to the Virginia corporate income tax in the same fashion and to the same degree as had these commercial and industrial taxpayers.

The railroads were under a completely different taxation scheme, whose burdens and benefits were never available to other industrial and commercial taxpayers, and which never involved depreciation as a taxing concept in any way.

Thus the position advanced by the Department seems the more logical: Virginia's railroads had been claiming the benefits and shouldering the burdens of a gross receipts tax, just as foreign corporations were shouldering the burdens and receiving the benefits of whatever taxation scheme they were subjected to in Maine, Wisconsin, or North Dakota.

By legislative fiat, the railroads were placed under the Virginia corporate income tax structure. To say that the railroads are entitled to some equivalent of the Extra Depreciation Deduction would be to argue that the railroads were situated similarly to those commercial and industrial taxpayers who were brought into conformity with the federal income taxation structure in 1972. This simply is not the case. In 1972 the railroads were not paying Virginia income tax. Moreover, the Extra Depreciation Deduction was designed for corporate taxpayers moving from *one* income taxation system to *another* income tax scheme, not from a *non* income tax scheme into an income tax scheme for the first time.

I recognize that the distinction drawn here must rest on real not feigned differences between otherwise similarly situated taxpayers. *Baker v. California Land Title Co.*, 349 F.Supp. 235, 238 (C.D.Cal.1972),

*aff'd,* 507 F.2d 895 (9th Cir.1974), *cert. denied,* 422 U.S. 1046, 95 S.Ct. 2664, 45 L.Ed.2d 699 (1975). Even if one took the superficial view that commercial and industrial taxpayers received tax advantages at the passage of the Conformity Act denied to railroads, and one took the further view that this somehow amounted to unequal treatment, even then the railroad could not make out a case that the inequality was discriminatory. The differences between the railroads and other industrial and commercial taxpayers are real ones, not fictive.

The Department of Taxation takes the position, and the Court agrees, that the whole reason for the transitional modifications established by the General Assembly for commercial and industrial taxpayers coming under the Conformity Act was to rectify differences in treatment under the pre-Conformity Virginia income tax and post-Conformity taxation based on the federal income taxing system. It bears repeating that at this point in time the railroads were not similarly situated with regard to *any* commercial and industrial taxpayer: *not* to an entire set of such taxpayers, *not* even to a single one of such taxpayers, because the RF & P was not paying income tax. The modifications were designed wholly and solely for those taxpayers who had already been paying Virginia corporate income tax prior to Conformity. As the Department notes, railroads which were brought under Virginia's Conformity income tax system effective 1 January 1979, had no Virginia income tax basis in their depreciable property immediately preceding that date because prior to that time railroads were not subject to the Virginia net income tax. Accordingly, Extra Depreciation Deduction had no relevance to railroads in Virginia. Granting an "extra" depreciation deduction to one who never had *any* depreciation deduction is a linguistic, and taxation, impossibility.

The same analysis shows the validity of the Department's position with regard to the railroads' nondepreciable property. It is axiomatic in income tax law that gain is not taxed until realized. An asset can be held for five years, twenty-five years, one hundred and twenty-five years, and only when it is sold will gain be taxed. Simply because, prior to 1979 the railroad was not under the Virginia income tax scheme (and thus any "gain" from the sale of an asset was non-taxable) gives it no logical reason for arguing that the increase in value of that property up to 1979 should somehow be exempt from Virginia income tax. No such deduction is provided by Virginia's income tax law to any other corporation newly coming under Virginia's corporate income tax. For example, if a New York corporation moved to Virginia and sold an asset, it would be taxed on the total amount of gain it had realized on that asset despite the fact that it may have held that asset for many years prior to moving to Virginia. The sale occurred in Virginia; gain was recognized in Virginia; the sale is the only relevant taxable event.

Accordingly, we find that the imposition of the Virginia corporate income tax to the RF & P is not discriminatory.

### CONCLUSION

Because we find (1) that 49 U.S.C. § 11503(b)(4) does not apply to income tax discrimination and (2) that even if, *arguendo,* it did so, the income tax in question is not discriminatory, defendant Department of Taxation's motion for judgment on the pleadings and cross-motion for summary judgment will be GRANTED.

Plaintiff RF & P's motion for summary judgment is DENIED.

And it is so ORDERED.