The KANSAS CITY SOUTHERN RAILWAY CO., et al., Plaintiffs-Appellees Cross-Appellants,

v.

Shirley McNAMARA, Secretary of the Dept. of Revenue and Taxation, State of Louisiana, Defendant-Appellant Cross-Appellee.

No. 86-3152.

United States Court of Appeals, Fifth Circuit.

May 27, 1987.

---

Robert G. Pugh, Shreveport, La., Howard M. Romaine, Dept. of Revenue & Taxation, Legal Section, Robert F. Smith, Baton Rouge, La., for defendant-appellant cross-appellee.

Hilton S. Bell, David M. Culpepper, Andrew Podolnick, F. Frank Fontenot, New Orleans, La., for plaintiff-appellees cross-appellants.

James W. McBride, Washington, D.C., for amicus-assn. of American R.R.

Before CLARK, Chief Judge, GOLDBERG, and GEE, Circuit Judges.

GEE, Circuit Judge:

The appellees are railroads doing interstate and intrastate business in Louisiana. They sued the state tax collectors, alleging that the Louisiana Tax on Transportation and Communication Utilities ("T & C" tax) discriminates against them in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4–R Act"). The district court ruled in favor of the railroads, but enjoined the collection of the T & C tax only insofar as it exceeded a locally assessed business license tax. We affirm the district court's holding that the T & C tax violates the 4–R Act, but we reverse its ruling that the discriminatory tax can be collected in part.

## A. Facts and Prior Proceedings

The railroads sued to enjoin the collection of the Louisiana T & C tax on the ground that it is prohibited by the 4–R Act. The T & C tax is a tax of 2% on the intrastate gross receipts of "public utilities" in Louisiana. La.Rev.Stat.Ann. § 47:1001.[1] The 4–R Act emerged from a long Congressional debate over improving the plight of the railroad industry. One result of this debate was 49 U.S.C. § 11503(b), which forbids discriminatory taxation of railroads. The statute prohibits states from assessing railroad property at a higher rate than other commercial property, § 11503(b)(1), levying or collecting at such a rate, § 11503(b)(2), levying or collecting ad valorem taxes at a discriminatory rate, § 11503(b)(3), or imposing "another tax that discriminates against rail carriers ...." § 11503(b)(4).[2]

In response, the Secretary of the Department of Revenue and Taxation argued that the district court did not have subject matter jurisdiction over the controversy because the railroads' claims did not fall within the 4–R Act's exception to the Tax Injunction Act. On the merits, the Secretary contended that § 11503(b) was meant to apply only to property taxes, and that § 11503(b)(4) should not be interpreted literally to give it unlimited scope; instead, it should be applied only to taxes "in lieu of" property taxes. The Secretary also contended that the tax was not discriminatory when viewed in the context of the entire state taxation scheme.

The district court first held that the 4–R Act applied to taxes other than property or "in-lieu" taxes. *Kansas City Southern Railway Co. v. McNamara*, 563 F.Supp. 199 (M.D.La.1983). After trial, the district court ruled the tax "discriminatory" within the meaning of § 11503(b)(4) because "The plain intent of the statute is that state taxation upon railroads shall be upon an equal footing with other commercial and industrial taxpayer[s] generally." *Kansas City Southern Railway Co. v. McNamara*, 624 F.Supp. 395, 399 (M.D.La.1985). The court decided that the T & C tax was a type of business license tax; it noted that "The

---

**1.** § 47:1001 reads:

Every person owning or operating, or owning and operating, any public utility in this state as defined in this Part, shall, in addition to all other taxes and licenses levied and assessed in this state, pay a license tax, for the privilege of engaging in such business in this state, of two per centum (2%) of the gross receipts from its intrastate business.

§ 47:1003(1) reads:

"Public utility" means railroads and railways, sleeping cars, motor bus lines, motor freight lines, express companies, telephone companies, telegraph companies, boat or packet lines, and pipe lines, as herein defined.

**2.** The statute reads:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem tax on rail transportation property at a tax rate that exceeds the tax rate applicable to the commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the [Interstate Commerce] Commission under subchapter I of chapter 105 of this title.

49 U.S.C. § 11503(b). For some reason, the parties rely on the language of Public Law No. 94–210, § 306(1), 90 Stat. 31, 54 (1976), which was the first version of this statute. Some courts have followed this practice. *See, e.g., Burlington Northern Railroad Co. v. Lennen*, 715 F.2d 494, 496 n. 1 (10th Cir.1983), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984). The first version was a syntactical nightmare, and Congress wisely rewrote its convoluted prose into a more intelligible form in Public Law No. 95–473, 92 Stat. 1337, 1446 (1978), quoted above as 49 U.S.C. § 11503(b). The second version explicitly admonishes that no substantive change is intended. *See* 92 Stat. at 1466. Because of—or perhaps in spite of—this admonition, we will ignore the parties' choice and use the more comprehensible current version.

only other business license tax levied in Louisiana which is comparable to the transportation and communications tax is commonly referred to as the occupation license tax." 624 F.Supp. at 400; *see* La.Rev.Stat. Ann. § 47:341 *et seq.* (authorizing local assessment of the occupational license tax). The court pointed out that the burden of the occupational license tax ($7,500 maximum per year per jurisdiction) was far less than the T & C tax. Accordingly, the court held that the T & C tax was discriminatory. The court decided, however, that it would enjoin collection of the T & C tax only to the extent that the amount collected "would exceed the highest amount that would be due under the occupational license tax." 624 F.Supp. at 402. Both sides appeal.

## B. *Jurisdiction and the Anti-Injunction Act*

The 4–R Act includes an exception to the Tax Injunction Act, 28 U.S.C. § 1341.[3] The first question we face is the breadth of the exception. By its terms, the 4–R Act exception to the Tax Injunction Act seems limited to assessment discrimination:

Notwithstanding section 1341 of title 28 and without regard to amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. *Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent,* the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction....

49 U.S.C. § 11503(c) (emphasis added).

This subsection is oddly cast. Read literally, it grants a sweeping exception to the Tax Injunction Act for claims under § 11503(b), then immediately takes away

jurisdiction on two of four substantive provisions of § 11503(b)—subsection (3) (discriminatory tax rates) and subsection (4) (other discriminations). Our colleagues on the Ninth Circuit have read the language of the jurisdictional section of the statute as a mistake. They think the statute was meant to read: "Relief *from discriminatory assessment* may be granted under this section only if the ratio of assessed value ...." *See Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860, 865–66 (9th Cir.) (despite literal language to contrary, statute permits claims in federal court for rate discrimination under § 11503(b)(3); to hold otherwise "leads to ... absurd result[s]"), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983). The Supreme Court has tacitly affirmed this reading of the statute. The Court recently held that at the behest of the railroads federal courts must determine whether a state tax authority has correctly determined fair market value; the Court did not mention that the relief requested by the railroads does not come within the literal meaning of the exception in § 11503(c). *See Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* — U.S. —, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987). Other courts reviewing claims under § 11503(b)(4) of non-property-tax discrimination have assumed jurisdiction, overleaping this issue without even addressing it. *See, e.g., Alabama Great Southern Railroad v. Eagerton,* 663 F.2d 1036 (11th Cir.1981). At oral argument, counsel for the Secretary besought us to follow the literal language of the statute, while all but conceding that such a reading is absurd. Because the result is absurd, we agree with the decisional law that the exception to § 1341 in § 11503(c) does not say exactly what it means. Federal courts have jurisdiction over a case alleging discriminatory taxation in violation of § 11503(b)(3) and (4).

## C. *The Scope of § 11503(b)(4)*

The Secretary argues with great force that § 11503(b) applies to *property* taxes

---

**3.** 28 U.S.C. § 1341 reads:
The district courts shall not enjoin, suspend or restrain the assessment, levy or collection

of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

only, and that § 11503(b)(4) is limited to taxes "in lieu" of property taxes. *Cf. Burlington Northern,* — U.S. at —, 107 S.Ct. at 1857 (one technique chosen by Congress to rehabilitate the railroad industry "was a prohibition on discriminatory state taxation of railroad property"). She points out that there is virtually no mention of anything but discriminatory property taxes and taxes "in lieu" of property taxes in the legislative history of § 11503(b).[4] *See generally Richmond, Fredericksburg & Potomac Railroad v. Dept. of Taxation,* 591 F.Supp. 209, 215–19 (E.D.Va.1984), *rev'd,* 762 F.2d 375 (4th Cir.1985). The Secretary also invokes the interpretive canon *ejusdem generis*[5] to bolster her argument that § 11503(b)(4) should not be read to swallow up the preceding subsections.

Every court but two that has considered the scope of § 11503(b)(4) has rejected the Secretary's position. The important exception is a powerful opinion by Judge Warriner in *Richmond, Fredericksburg,* 591 F.Supp. at 220–21 (§ 11503(b)(4) does not reach income taxes).[6] For all its logic, however, that decision is now the equivalent of a law review article; it was reversed on precisely this issue by the Court of Appeals. *Richmond, Fredericksburg,* 762 F.2d at 379. Nevertheless, Judge Warriner's opinion is a cogent argument in the Secretary's favor. The opinion makes a good case from the legislative history that

the extremely broad language of § 11503(b)(4) was not intended to swallow the rest of the carefully crafted statute. The Association of American Railroads has filed an amicus brief in this case containing contrary arguments based on extensive research into the legislative history. The presence of this brief is itself a tacit concession by the railroads to the power of Judge Warriner's argument to inspire apprehension, even from the grave.

Within the rococco trappings of *"ejusdem generis"* and "legislative history," the Secretary's argument and Judge Warriner's opinion pose a simple and compelling rhetorical question:

Why would Congress debate for 15 years about discriminatory *property* taxes, write various bills that dealt only with *property* taxes, and then, without discussion and only a few weeks before enactment, tack on to a section entitled "Tax discrimination against rail transportation *property*"[7] a subsection that is unlimited in scope and reduces the rest of the section to superfluous detail?[8] The question is a good one.

But starting with dicta in *Ogilvie v. State Board of Equalization,* 657 F.2d 204, 210 (8th Cir.) (the purpose of § 11503(b) "was to prevent tax discrimination against the railroads in any form whatsoever"), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981), and ripening into a holding in *Alabama Great*

---

4. The "in lieu" language from the early railroad protection bills did not survive to the completed 4–R Act, but it eventually found its way into the Airport and Airway Improvement Act of 1982. *See Western Airlines, Inc. v. Board of Equalization of the State of South Dakota,* — U.S. —, 107 S.Ct. 451, 93 L.Ed.2d 399 (1986).

5. In the construction of laws, wills, and other instruments, the "ejusdem generis rule" is, that where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be constued in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.

H.C. Black, *Black's Law Dictionary* 608 (4th ed. 1968); *see, e.g., Brown & Root, Inc. v. Donovan,* 747 F.2d 1029, 1032 (5th Cir.1984) (interpreting the phrase "in any other action" in Title 42 U.S.C. § 5851(a)(3) (1982) ).

6. The other court anticipated Judge Warriner's position, with the same result on appeal. *See Alabama Great Southern Railroad Co. v. Eagerton,* 501 F.Supp. 1044 (M.D.Ala.1980), *rev'd,* 663 F.2d 1036 (11th Cir.1981).

7. The original version enacted as Public Law No. 94–210, § 306(1), 90 Stat. 31, 54 (1976), read: "Prohibiting Discriminatory Tax Treatment of Transportation *Property*" (emphasis added).

8. In Judge Warriner's words:

To simply look at the language of subsection (4) and say "It means what it says," requires tunnel vision. A mere flick of the eye over the rest of the statute reveals that it couldn't mean what it says, unless Congress is a fool. I don't think Congress is a fool. At least there should be a rule of statutory construction that Congress is presumed not to be a fool.

*Richmond, Fredericksburg,* 591 F.Supp. at 221.

*Southern Railroad v. Eagerton*, 663 F.2d 1036, 1040 (11th Cir.1981) ("paragraph (d) [§ 11503(b)(4)] is indeed intended as a catchall provision to prevent discriminatory taxation of a railroad carrier by any means"), and again and again since, federal and state courts have given an equally powerful if tacit answer: Although Congress was long concerned with blatant property-tax discrimination by many states, it realized near the end that banning discriminatory property taxes was not enough to save the railroads from unfair state taxation. Congress therefore added § 11503(b)(4) to ensure that the statute would not fail of its broader purpose. *See, e.g., Trailer Train Co. v. Bair*, 765 F.2d 744, 745 (8th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 572, 88 L.Ed.2d 556 (1985); *Richmond, Fredericksburg & Potomac Railroad v. Dept. of Taxation*, 762 F.2d 375, 379 (4th Cir.1985); *Atchison, Topeka & Santa Fe Railway v. Bair*, 338 N.W.2d 338, 345 (Iowa 1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984); *Atchison, Topeka & Santa Fe Railway v. Bair*, 535 F.Supp. 68 (S.D.Iowa 1982).

Whatever Congress may have meant by § 11503(b)(4), we must first focus on what it said. Judicial faithfulness to legislative will consists not in crude gropings into the consistently dark closets of legislative history but in a fine faithfulness to the mediating power of the legislative word. Our legislators are servants of the public, and when they speak in statutory language—that most public form of discourse—their motives and desires are submerged into a public product intelligible in a public context.[9] If we do not take a legislative body at its word, we run the risk of substituting our own normative (and inherently nondemocratic) views, of disrupting the strange political trade-offs that make democracy possible,[10] of—worst of all—polluting a public language of relatively fixed meaning and reference, a language necessary for the public discourse we call self-government. We will run these risks when the statutory language leads to absurdities, *see supra* section B, but not when the language of the statute merely makes Congress look foolish. *See supra* note 8.

The meaning of this statute is clear enough. Congress was most concerned with property tax discrimination, and it voiced that concern in detail in § 11503(b)(1)–(3); but it included § 11503(b)(4) to ensure that states did not shift to new forms of tax discrimination outside the letter of the first three subsec-

9. *See INS v. Cardoza-Fonseca*, —— U.S. ——, ——, 107 S.Ct. 1207, 1224, 94 L.Ed.2d 434 (1987) (Scalia, J., concurring) ("Judges interpret laws rather than reconstruct legislators' intentions. Where the language of those laws is clear, we are not free to replace it with an unenacted legislative intent.").

10. *See Crippen v. Mint Sales Co.*, 139 Miss. 87, 103, 103 So. 503, 505 (1925) (Ethridge, J., dissenting):

[I]t would be a dangerous undertaking for the court, [even] if it had the power[,] to undertake the job of correcting legislative mistakes and follies, for there is much in the statutes of the past dozen years evidencing midgetminded statesmen and much of folly. Still I am not disposed to be hard on the Legislature. Taken as a whole it does good work and eliminates many unwise measures. There are men in the Legislature who could fill any station in the government with credit, and the majority would class as "average and better." But there are usually some 35 per cent. to 40 per cent. of the membership whose only excuse for being sent to the Legislature is to keep them out of the race for constables and justices of the peace. These men have votes and have to be reckoned with by the wise ones in shaping the legislation of the session. If you antagonize their bills they strike back. They are strong on midget legislation and when they introduce a bill to place jay birds under peace bonds, or to muzzle seed ticks, or to prohibit vending machines in stores, the wise ones will vote with them for the sake of more important measures coming on. None of these pigmy statesmen go after large questions and undertake their solution, they attack small tasks. They are strong on moral questions or something that sounds well which they can take back home to their people for home consumption in future politics. They go around with a spiritual microscope searching for the germs of evils in trifles, while utterly ignoring the mountains of iniquity which stand out in plain view in the nearby landscape. Instead of making war on the beasts and birds of prey that menace society they hunt for earth worms. Conscious of their inability to deal with large matters they make a record from trifles garbed in high sounding phrases.

tions of § 11503(b). Nor is the rule of *ejusdem generis* of help. That "rule" is an interpretive rule-of-thumb, not a "rule" in the sense of a principle with independent analytical force. It merely summarizes a common-sense judicial response to centuries of lawyers' implausible interpretations of serial clauses.[11] Besides, it is too late in the jurisprudential day for us to agree with the Secretary and Judge Warriner. The shadows have lengthened across their arguments, as one-by-one every Court of Appeals that has considered the issue has sided with the railroads' position. Although these decisions do not bind us, we do not lightly disregard such unanimity; and we would do so only were we convinced that those decisions are wrong. Obviously, we are not at all convinced they are wrong. We hold that § 11503(b)(4) forbids all forms of tax discrimination against railroads by states.

The meaning of "discrimination" presents a somewhat stickier problem.

### D. Discrimination under § 11503(b)(4)

The district court's opinion nicely summarized the problem of defining "discrimination":

In order to determine whether an action discriminates against a group or class, the effect of the action must be compared to the effect on others. Not surprisingly, the parties do not agree as to the proper group or class to which the railroads should be compared. Plaintiffs insist that they must be compared to all other commercial and industrial taxpayers, while defendant asserts that the railroads should be compared only to those other utilities which are subject to the [T & C] tax.... While the ad valorem tax provisions of § 306(1)(a), (b), and (c) [§ 11503(b)(1), (2) and (3) ] make it plain

that for ad valorem purposes, the railroads are to be compared to all other commercial and industrial taxpayers, the provisions of § 306(1)(d) [§ 11503(b)(4) ], with which we are here concerned, have no such clear mandate.

624 F.Supp. at 399. The district court concluded, relying on *Great Southern Railway v. Eagerton*, 541 F.Supp. 1084 (M.D. Ala.1982), that the class of "other commercial and industrial taxpayers which pay the same type of tax" is the appropriate standard for § 11503(b)(4).

The Secretary advances three alternative arguments to demonstrate that the T & C tax is not discriminatory. First, she argues that the T & C's classification of railroads with other common carriers is reasonable and non-discriminatory. Second, she argues that the T & C tax is "complementary" to the General Sales and Use Tax which the railroads have purportedly underpaid or escaped. Third, she argues that in general there is no tax discrimination against the railroads by the State of Louisiana.

### (1) Is the T & C Tax Discriminatory?

The T & C tax applies to "public utilities." La.Rev.Stat.Ann. § 47:1001. "Public utilities" is defined to include railroads, motor bus lines, motor freight lines, express companies, boat or packet lines, and pipe lines. § 47:1003(1). The Secretary argues that the impetus behind the 4-R Act was not simply the desire to give the railroads special advantages or merely to maintain them in existence—that could have been accomplished more easily by subsidies (as in the case of the American merchant marine) than by deregulation. Rather, the point was to put the railroads back on an even footing with other forms of transportation.[12] Therefore, we are

---

11. *See, e.g., Mobil Chemical Co. v. Blount Brothers Corp.*, 809 F.2d 1175, 1181–82 (5th Cir.1987).

12. *See, e.g.,* 121 Cong.Rec. S38461 (1975) (remarks of Sen. Hartke) (emphasis added):

As most of my colleagues here realize, we would not have to pass the legislation before the Senate today if there had not been a rather significant imbalance in Federal assist-

ance to the various modes of transportation over the past several decades. This inequity in treatment does not apply just to the Federal Government. The States tax rail rights-of-way with some recent exceptions, such as Connecticut. *The motor carriers and water carriers, the chief competitors of the railroads, pay only user taxes, or in the case of water carriers, no tax for use.* It seems to me that if the Senate

told, a tax analyzed under § 11503(b)(4) need not be compared with the general class of "all other commercial and industrial" taxpayers as in § 11503(b)(1)–(3); instead, it should be compared with taxes against competitive modes of transportation. The T & C class does not illegally discriminate against the railroads because it also applies to their main competitors. *See Atchison, Topeka & Santa Fe Railway v. Bair,* 338 N.W.2d 338 (Iowa 1983) (comparing state tax on railroad fuel to fuel taxes on three competitive modes of transportation), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984).

The only simple way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers. A large group of local taxpayers will have the political and economic power to protect itself against an unfair distribution of the tax burden. The class of taxpayers subject to the T & C tax is simply too small and too foreign to fulfill this function—for all we know, the T & C tax may be an unfair burden on *all* taxpayers subject to it. And, as we discuss below, the cost of actually figuring out whether the T & C tax is unfair is simply too high. We think the best course is to require that the railroads be taxed only under taxes applicable to "other commercial and industrial" taxpayers.[13]

We recognize that the 4–R Act puts severe limits on the broad discretion usually afforded state taxing authorities. A state may not have, for example, a broad class of commercial and industrial taxpayers; instead, it may have a number of smaller classes based on size and line of business, with taxes varying markedly from class to class. Moreover, this "unequal" classification may be perfectly fair and reasonable, given variations from class to class in externalized costs of doing business and in state services provided to members of each. Our holding may preclude the state from putting the railroads into one of these smaller tax classes even if that classification is perfectly fair. The T & C tax itself may be fair.

The 4–R Act, however, is a prophylactic rule to prevent tax discrimination. It forbids some fair arrangements because the actual fairness of those arrangements is too difficult and expensive to evaluate. *See infra* section D(3). We hold that the state of Louisiana can satisfy the prophylactic strictures of the 4–R only by a more mechanical equality between its taxation of the railroads and its taxation of the class of "other commercial and industrial" taxpayers generally.[14] In a proper case, the state might be able to show that a tax class that includes railroads is necessarily small because of the nature of the tax *and* that the tax on members of that class is directly related to services provided them by the state and does not cross-subsidize other taxpayers. *Cf. Atchison, Topeka & Santa Fe Railway v. Bair,* 338 N.W.2d at 346 (although income from fuel tax is used only to support railroads, it violates § 11503(b)(4) because it is not applied evenhandedly to three competitive modes of

---

is going to address the question of State taxation of rail rights-of-way, we should do so in a comprehensive way that gets at the kind of problems that led to these bankruptcies in the first place.

**13.** The district court held that the proper comparison group under § 11503(b)(4) is "other commercial and industrial taxpayers which pay the same type of tax." 624 F.Supp. at 399. The problem with this formulation is that it appears to allow the state to discriminate against the railroads by simply making sure that only a few powerless business taxpayers pay "the same type of tax."

**14.** We express no premature views on the proper formal techniques. For a review of *judicially*-created formal equality in the property-tax con-

text, compare *General American Transportation Corp. v. Kentucky,* 791 F.2d 38, 43 (6th Cir.1986) (holding that under 4–R Act property taxes should be assessed at a rate equal to the mean rate of many distinct classes of business property), with *Clinchfield Railroad Co. v. Lynch,* 700 F.2d 126, 131 n. 5 (4th Cir.1983) (median rather than mean assessment ratio is proper measure), and *Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860, 867–68 (9th Cir.) (in a state with only two tax rates, district court should determine which rate applies to the majority of commercial and industrial property; if that determination is impossible, court should average the two rates), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983).

transportation that consume fuel). But the class of taxpayers included in the T & C tax is unnecessarily small, and the T & C tax is therefore discriminatory within the meaning of § 11503(b)(4).[15]

### (2) Does T & C Tax "Complement" the General Sales and Use Tax?

Accepting for the sake of argument that the T & C tax is facially discriminatory, the Secretary invokes the "complementary tax" doctrine of dormant Commerce Clause litigation in an effort to show that the T & C tax and the Louisiana General Sales and Use Tax, La.Rev.Stat.Ann. § 47:301 *et seq.*, are "complementary." *See, e.g., Armco Inc. v. Hardesty,* 467 U.S. 638, 642, 104 S.Ct. 2620, 2622, 81 L.Ed.2d 540 (1984) ("It long has been established that the Commerce Clause of its own force protects free trade among the States."). The Secretary urges us to uphold the T & C tax on the theory that it is "complementary" or equivalent to the Sales and Use Tax and that the railroads do not pay their fair share of the Sales and Use Tax.

▋ Although it may be helpful in analyzing some aspects of the problem, Commerce Clause doctrine does not answer the questions posed by the 4–R Act. In a Commerce Clause attack the courts will not "deal in abstractions. In this type of case the taxpayers must show that the [challenged tax] formula places a burden upon interstate commerce in a constitutional sense." *Northwestern Cement Co. v. Minnesota,* 358 U.S. 450, 463, 79 S.Ct. 357, 365, 3 L.Ed.2d 421 (1959). Any state tax scheme is prima facie valid, and the Commerce Clause will "of its own force" invalidate state laws only when the taxpayer can show that the laws will actually operate in a discriminatory fashion. *See Maryland v. Louisiana,* 451 U.S. 725, 756, 101 S.Ct. 2114, 2134, 68 L.Ed.2d 576 (1981) ("A state

tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme.").

▋ But the 4–R Act alters the legal landscape. Congress, acting pursuant to its extensive Commerce Clause powers, has commanded that the states not impose any tax "that discriminates against a rail carrier." § 11503(b)(4); *cf. Arizona Public Service Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979) (federal antidiscrimination tax statute goes beyond minimum protections of the Commerce Clause). The 4–R Act reverses and changes the burden of persuasion found in the dormant Commerce Clause cases. In a 4–R case, the railroads need only establish that the tax is facially discriminatory, after which the tax must be justified, if possible, by the state. *See, e.g., Burlington Northern Railroad Co. v. Lennen,* 715 F.2d 494, 497 (10th Cir.1983) (discussing discriminatory property tax rates), *cert. denied,* 467 U.S. 1230, 104 S.Ct. 2690, 81 L.Ed.2d 884 (1984). It may be that in an appropriate case we would allow the state to save a facially discriminatory tax by showing that it is *necessary* to "compensate" for some state or local tax—a tax applicable to "other commercial and industrial" taxpayers—that for some reason *cannot* be levied against the railroads. Assuming that a facially discriminatory tax could be rescued on such a showing, the Secretary obviously cannot meet this burden here because the Sales and Use Tax is fully applicable to the railroads and, in fact, she is presently suing them for underpayment of that tax. Appellant's Brief at 6.

The Secretary asks us to consider two facts about the application of the General Sales and Use tax to the railroads that should allow her to supplement it with the T & C tax. First, railroad services are not included in services subject to the tax. *See*

**15.** We need not and do not decide the size of the tax class that § 11503(b)(4) requires. Presumably, putting railroads in a class that includes a substantial majority of "other commercial and industrial" taxpayers would comply with the statute. Also, distinctions based on wealth, such as progressive tax rates, probably do not violate the statute. *See Burlington Northern*

*Railroad Co. v. Bair,* 766 F.2d 1222, 1224 (8th Cir.1985). Taxes that can apply only to a limited number of taxpayers present a much more difficult problem of potential discrimination. *See Atchison, Topeka & Santa Fe Railway v. Bair,* 338 N.W.2d at 346 (comparing state tax on railroad fuel to fuel taxes on three competitive modes of transportation).

§ 47:301(14). Second, the Louisiana legislature has recently exempted railroad rolling stock from the Sales and Use tax. *See* § 47:305.45. In effect, the Secretary asks us to allow her to use the T & C tax to "complement" the Sales and Use tax so she can recover Sales and Use taxes that the State of Louisiana has determined that the railroads should not pay. This argument does not merit discussion. *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976) ("The injuries to the [state] plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective legislatures.... No State can be heard to complain about damage inflicted by its own hand.").

### (3) Is the Tax Structure of Louisiana Fair to the Railroads?

Finally, the Secretary asks us to consider the overall tax burden of the railroads and to compare that burden with all other commercial and industrial taxpayers. She argued at trial and argues here that, even when the T & C tax is included, the railroads paid far less than their fair share of state taxes. From the sketchy evidence adduced at trial by both sides, we are perfectly willing to concede that the Secretary might be correct. But, however relevant her argument may be to an assessment of the wisdom of the 4–R Act, it is irrelevant to a claim under it.

Determining the intrinsic economic fairness of a tax system to a particular taxpayer is a paradigm of the kind of polycentric problem for which courts are ill-suited. In effect, we would have to determine the fairness of the tax system to *each and every* taxpayer in order to decide whether it was fair to *any one* of them. *See* Fuller, *The Forms and Limits of Adjudication*, 92 Harv.L.Rev. 353, 394–404 (1978). In the words of the Surpeme Court,

> [C]ourts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. The complexities of factual ec-

onomic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes. *Minneapolis Star v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 589–90, 103 S.Ct. 1365, 1374, 75 L.Ed.2d 295 (1983) (footnote omitted). Aside from the theoretical difficulty of assessing the basic fairness of a state tax system, an attempt to make the assessment would be extraordinarily costly both to the parties and the judicial system. Furthermore, there is no reason in principle why the railroads could not sue for such a judicial assessment *each year* (or for each tax bill) because the dynamic nature of any state's economy will alter the relative benefits and burdens of its tax system from moment to moment. Despite these profound problems, courts undertake the kind of tax analysis suggested by the Secretary in the absence of controlling statute and when the risk of error falls equally on important constitutional interests on both sides. *See Minneapolis Star*, 460 U.S. at 589 n. 12, 103 S.Ct. at 1374 n. 12. But this case does not require it.

The 4–R Act precludes the difficult analysis that the. Secretary requests. The statute speaks in simple and categorical terms about property tax rates and assessments, § 11503(b)(1)–(3), then prohibits "another tax that discriminates against a rail carrier ...." § 11503(b)(4).[16] The focus is on particular taxing entities—"a State, subdivision of a State, or authority acting for a State or subdivision"—and particular assessments and particular taxes. There is nothing in the statute that even suggests that an individually discriminatory tax should be assessed for fairness against the entire tax structure of the state.

Because of the statute's simple—we are tempted to say simplistic—structure, our colleagues on other Circuit Courts have refused invitations to undertake polycentric inquiries under various theories of the 4–R Act. For example, the Sixth Circuit has

---

**16.** Section 306(d) of the original Act used even more categorical language: "The imposition of *Any other tax* which results in discriminatory treatment of a common carrier [is forbidden]...." 90 Stat. at 54.

refused a state's invitation to consider the cumulative effect of taxes by distinct taxing entities within the state as justification for a facially discriminatory tax. *See General American Transportation Corp. v. Kentucky,* 791 F.2d 38, 42 (6th Cir.1986); *but cf. Clinchfield Railroad Co. v. Lynch,* 700 F.2d 126, 130 & n. 5 (4th Cir.1983) (comparing local and central property taxes without discussion). While withholding judgment on the actual result in *General American,* we agree with its general view of the statute—the categorical language of the 4–R Act demands bright-line rules for simple judicial administration.

We have already acknowledged that the prophylactic nature of the 4–R Act handicaps state legislatures and tax collectors in the fulfillment of their taxing duties. It does not, however, completely disable them. If state authorities approach the problem carefully, we trust that they can create tax structures that comply with the 4–R Act while ensuring that the railroads pay their fair share of state taxes. We will not do that job for them.

### E. The Propriety of the Partial Injunction

The railroads argue that the district court should not have partially enjoined the T & C tax because of the existence of an equivalent locally-assessed occupational license tax. They cite *Arizona Public Service Co. v. Snead,* 441 U.S. 141, 99 S.Ct. 1629, 60 L.Ed.2d 106 (1979) (discriminatory electricity taxes forbidden by 15 U.S.C. § 391), *General American Transportation Corp. v. Kentucky,* 791 F.2d 38, 42 (6th Cir.1986) (refusing to examine entire tax structure of state in 4–R Act case), *Atchison, Topeka & Santa Fe Railway v. Bair,* 338 N.W.2d 338, 346 (Iowa 1983) (same), *cert. denied,* 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984), and *Alabama Great Southern Railroad Co. v. Eagerton,* 541 F.Supp. 1084, 1086 (M.D.Ala. 1982) (ignoring "equivalent" business license tax), for the proposition that courts refuse to look at the total effect of state and local taxes in determining whether a given state tax is discriminatory within the

meaning of a federal non-discrimination statute.

The Secretary responds with more citations to the Commerce Clause cases; for the reasons given above, these cases do not help us. However, we have identified other arguments in her favor. First, in *Clinchfield Railroad Co. v. Lynch,* 700 F.2d 126 (4th Cir.1983), the Fourth Circuit affirmed a partial injunction by the district court based on a court-created non-discriminatory property tax rate. The district court had derived the non-discriminatory rate by setting it at the median of a variety of business tax rates. The comparative business taxes, however, were locally assessed, while the partially-enjoined tax on railroads was centrally assessed. Moreover, the court affirmed the district court's scheme despite the fact that the district court had not even used other centrally-assessed property taxes (mainly taxes on public utilities) in setting the median rate. *Clinchfield Railroad,* 700 F.2d at 130 n. 5. Second, federal courts will partially enjoin illegal tax rates and assessments schemes to eliminate only their discriminatory effects rather than enjoining the entire rate or assessment scheme and requiring state authorities to comply with federal law from scratch. *See, e.g., General American Transportation Corp.,* 791 F.2d at 40–43 (discriminatory rates); *Clinchfield Railroad Co. v. Lynch,* 700 F.2d at 131 n. 6 (discriminatory assessments); *Trailer Train Co. v. State Board of Equalization,* 697 F.2d 860 (9th Cir.) (discriminatory rates), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983). These remedial techniques under the 4–R Act tend to support the propriety of the district court's partial injunction. Finally, it could be argued that in 4–R litigation we should distinguish between the liability phase and the remedial phase in the use of other state taxes. While it might not be permissible to consider allegedly "equivalent" or "compensating" state taxes in determining whether or not a given state tax is discriminatory, it is permissible to consider such taxes when determining the proper remedy for the discriminatory tax.

The Secretary's position does not persuade us. The distinction between rights and remedies is pointless because in both cases the language of the statute does not appear to leave room for the difficult task of sorting out "complementary" or "equivalent" taxes. The partial injunctions of discriminatory taxes and tax assessments in cases like *General American Transportation* and *Trailer Train* are proper because they involve *one* kind of tax and *one* taxing entity. Finally, we do not need to decide whether to accept or reject the decision in *Clinchfield Railroad,* or the apparently contradictory decision in *General American Transportation Corp.*[17] Those cases involved *property* taxes, and the difficulty of assessing locally the property of railroads—which is largely made up of mobile rolling stock—might justify *Clinchfield Railroad's* comparison of the rates of locally-assessed taxes with centrally-assessed taxes. There is no comparable difficulty with a tax on the privilege of doing business in a state or its subdivisions.

■ We are compelled to reverse the district court's partial injunction by the logic of our arguments affirming its holding that the T & C tax is discriminatory. Although the district court's decision seems fair on the clear facts of this case, that cannot save it. Once we start down the slippery slope of enjoining discriminatory taxes only to the extent that they exceed "equivalent" taxes by other taxing entities, we destroy the bright lines created by § 11503(b) itself. Furthermore, if we affirm the district court's partial injunction, we will consign every 4–R case to a trial on the merits like the one in this case—an unproductive "battle of the experts" on whether any taxes levied in the state are "equivalent," and if so, which ones. Short of some sort of strong prima facie showing by the state of necessity, as we suggest above in sections D(1) and (2), we think a trial on whether a tax is discriminatory or not can and should be avoided. In this case, there is clearly no necessity—the local entities could tax the railroads under the business license tax and pass the money on to the state, or the state could centrally assess the business license tax against all businesses (including railroads).

We recognize that our conclusion is somewhat formalistic. But the 4–R Act is formalistic. And, again, we have faith in the abilities of the state tax collectors to reach the pockets of the railroads with taxes that are actually and formally fair.

## F. Conclusion

For better or worse, the tax provisions of the 4–R Act give us few substantive and procedural standards. Therefore, in the manner of the common law, we must work out the meaning of 49 U.S.C. § 11503 gradually in relation to specific disputes. Our opinion expresses a general view of the statute, but our ruling is narrow. We hold that federal courts have jurisdiction under § 11503(c) over claims by railroads of tax discrimination under § 11503(b)(4), that the Louisiana Tax on Transportation and Communication Utilities violates the requirements of § 11503(b)(4), and that collection of the T & C tax should be unconditionally enjoined. Nothing in this opinion, however, is meant to discourage the Secretary and the Louisiana legislature from fairly taxing the railroads within the formal demands of the 4–R Act. The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for modification

---

**17.** This argument [by the state] fails for the reasons stated in [the district court's] opinion: "The 4–R Act speaks in terms of the *State* as an individual taxing entity as the proper focal point of 4–R Act analysis, and not any combined property tax rate scheme within that state. [...]" Kentucky does not contend that fifty-five cents of each dollar [the discriminatory amount] collected by the state was delivered over to local taxing authorities, nor that the state acted only as a collection agent for local authorities.... Nor does it allege that in all other cases, local taxing authorities merely acted as collection agents for the state. We therefore agree with [the district court] that the 4–R Act requires that we compare Kentucky's ad valorem tax on rolling stock with the rate levied on commercial and industrial property by the state alone, and not the aggregate of rates levied by the state, county, city and other taxing authorities.

*General American Transportation Corp.,* 791 F.2d at 39–40.

of the judgment in accordance with this opinion.