The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Delaware corporation; Southern Pacific Transportation Company; Arizona Central Railroad, Plaintiffs–Appellees,

v.

STATE OF ARIZONA; Arizona Department of Revenue; City of Phoenix and Town of Clifton, Defendants–Appellants.

No. 94–15850.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 19, 1995.

Decided March 4, 1996.

Paul J. Mooney, Fennemore Craig, Phoenix, Arizona, for the plaintiffs-appellees.

James M. Susa, Assistant Attorney General, Phoenix, Arizona, for the defendants-appellants.

Before FERGUSON and HAWKINS, Circuit Judges, and NIELSEN,* District Judge.

FERGUSON, Circuit Judge:

The State of Arizona appeals the district court's grant of summary judgment in favor of the plaintiffs. The district court held that Arizona's taxation scheme discriminated against the railroads and therefore violated the Railroad Revitalization and Regulatory Reform Act. We reverse.

I. *Statement of the Case*

A. *Factual Background*

The State of Arizona imposes both a transaction privilege tax and a use tax. Ariz.Rev. Stat.Ann. §§ 42–1301 et seq., 42–1401 et seq. (1991).[1] The Arizona transaction privilege tax, which is similar to a sales tax, is applicable to most businesses in Arizona. It is generally imposed at a rate of five percent on the sale of goods and services occurring in the state. The Arizona use tax is a reciprocal tax which imposes a five percent levy on the price of goods purchased outside the state which are later brought into the State for use, storage, or consumption.

The Arizona transaction privilege tax is applicable to seventeen classifications of industrial and commercial taxpayers.[2] The transporting classification of the transaction privilege tax is defined as "the business of transporting for hire persons, freight or property by motor vehicle, railroads or aircraft from one point to another point in this state." Ariz.Rev.Stat.Ann. § 42–1310.02 (1991).

Motor carriers are exempt from the transporting classification of the transaction privilege tax because they are taxed under a separate tax scheme. Motor carriers are taxed under Ariz.Rev.Stat.Ann. § 28–1599 et

---

* Honorable Wm. Fremming Nielsen, District Judge for the Eastern District of Washington, sitting by designation.

1. In addition, most Arizona cities and towns have adopted the Model City Tax Code which imposes a transaction privilege tax similar to the Arizona state transaction privilege tax.

2. The seventeen classifications of businesses to which the transaction privilege tax applies are: retail sales, transporting, utilities, telecommunications, publication, job printing, pipelines, private car lines, commercial leases, transient lodging, personal property rentals, mining, amusement, restaurant, prime contracting, owner-builder sales and membership camping. Ariz.Rev.Stat.Ann. §§ 42–1310.01–.18 (1991 & Supp.1995).

seq. (1989). The motor carrier tax is a weight-distance tax. It is generally calculated by multiplying the number of miles traveled by a motor vehicle on the public highways within the State of Arizona, by the applicable motor carrier tax rate for that motor vehicle's weight class. Ariz.Rev.Stat. Ann. § 28–1599.05(B) (1989). The motor carrier tax is not applicable to the railroads.

### B. *Procedural Background*

The State of Arizona Taxing Authorities determined that additional transaction privilege taxes were due on Southern Pacific Transportation Company's activities within Arizona. After two unsuccessful administrative appeals, Southern Pacific and the Atchison, Topeka, and Santa Fe Railroad brought suit in district court. The railroads sought a declaratory judgment that the State of Arizona's transaction privilege tax and use tax were discriminatory in violation of The Railroad Revitalization and Regulatory Reform Act (the "4–R Act"), 49 U.S.C. § 11503 (1988), and a permanent injunction against the further imposition of these taxes for current or subsequent tax periods.[3]

After filing their complaint, Southern Pacific and Santa Fe moved for a preliminary injunction to prohibit the collection of the alleged discriminatory taxes. The district court denied this motion on the basis that discriminatory taxation occurs when the railroads are subject to a tax which applies only to a narrow class of taxpayers. The district court held that because the Arizona transaction privilege tax and use tax were applicable to a broad class of taxpayers, they were not discriminatory.

The Taxing Authorities then moved for summary judgment against the railroads. In response, the railroads filed a cross-motion for summary judgment against the Taxing Authorities. The district court granted the railroads' motion for summary judgment, holding that the Arizona tax scheme discriminated against the railroads because the railroads' major competitors, motor carriers,

were exempt from the Arizona transaction privilege tax and use tax.

### II. *Discussion*

We review a grant of summary judgment de novo. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

Three interrelated issues are raised by this litigation: (1) Is the 4–R Act, which seeks to prevent discriminatory taxation of the railroads, applicable to the Arizona tax scheme? (2) If so, what is the proper comparison class to employ in determining whether the Arizona tax scheme discriminates against the railroads? (3) Does the Arizona tax scheme discriminate against the railroads?

### A. *Analysis Under the 4–R Act*

The 4–R Act was enacted by Congress in 1976 to restore financial stability to the railroad system in the United States. *Department of Revenue v. ACF Indus., Inc.*, —— U.S. ——, ——, 114 S.Ct. 843, 846, 127 L.Ed.2d 165 (1994). Congress' purpose was to revitalize the railroads and protect them from discriminatory taxation. *Id.* The applicability of subsection (b)(4) of the 4–R Act is at issue in the present case.

The provisions of the 4–R Act relevant to this case are as follows:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a state may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assess-

---

**3.** The railroads also challenged the City of Phoenix's and Town of Clifton's transaction privilege taxes in this litigation.

ment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

49 U.S.C. § 11503(b)(1)–(4).

The State of Arizona argues that Section 11503(b)(4) of the 4–R Act is not applicable to the transaction privilege taxes and use taxes at issue in this litigation. Arizona asserts that Section 11503(b)(4) prohibits only "in lieu" taxes imposed on the railroads in place of discriminatory property taxes. Such discriminatory property taxes are prohibited by subsections (b)(1) through (b)(3) of Section 11503.

The State's narrow interpretation of subsection (b)(4) of the 4–R Act has been rejected by many Circuits. In *Richmond, F. & P. R.R. v. Department of Taxation*, 762 F.2d 375, 379–80 (4th Cir.1985), it was held that subsection (b)(4) was unambiguously intended to prohibit all discriminatory taxes imposed on rail carriers. The Fifth Circuit, Eighth Circuit, and Eleventh Circuit have reached similar conclusions regarding the scope of subsection (b)(4). *Kansas City S. Ry. v. McNamara*, 817 F.2d 368, 371–74 (5th Cir.1987) (holding that subsection (b)(4) applied to a state transportation and communications utilities tax imposed on gross receipts of intrastate business and rejecting the state's argument that subsection (b)(4) only applied to in lieu taxes); *Trailer Train Co. v. State Tax Comm'n*, 929 F.2d 1300, 1302 (8th Cir.) (holding that subsection (b)(4) forbids all taxes that discriminate against railroads, and not just discriminatory property taxes), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 133 (1991); *Trailer Train Co. v.*

*State Bd. of Equalization*, 710 F.2d 468, 472 n. 6 (8th Cir.1983); *Ogilvie v. State Bd. of Equalization*, 657 F.2d 204, 210 (8th Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981); *Alabama Great S. R.R. v. Eagerton*, 663 F.2d 1036, 1040 (11th Cir. 1981).

■ We hold that subsection (b)(4) of the 4–R Act is designed to encompass all discriminatory state taxes, not just discriminatory property taxes or in lieu taxes. Therefore, subsection (b)(4) is applicable to the analysis of Arizona's transaction privilege tax and use tax at issue in this case.

### B. *The Choice of Comparison Class*

■ In determining whether the Arizona taxes discriminate against the railroads, the district court compared the treatment of the railroads with the treatment of their major competitors, motor carriers. The district court erred in its choice of a comparison class. We hold that the proper comparison class to use in analyzing discriminatory taxation of the railroads under the 4–R Act is "all other commercial and industrial taxpayers subject to the taxes."

Many courts have already employed the comparison class of "other commercial and industrial taxpayers subject to the tax" in analyzing subsection (b)(4) of the 4–R Act. In *Kansas City S. Ry. v. McNamara*, 817 F.2d 368 (5th Cir.1987), the court stated:

> The only simple way to prevent tax discrimination against the railroads is to tie their tax fate to the fate of a large and local group of taxpayers.... We think the best course is to require that the railroads be taxed only under taxes applicable to '*other commercial and industrial*' taxpayers.

*Id.* at 375 (emphasis added). Similarly, the Seventh Circuit held that "a tax is 'discriminatory' within the meaning of the fourth subsection of the 4–R Act if it imposes a proportionately heavier tax on railroading *than on other activites.*" *Burlington N. R.R. v. City of Superior*, 932 F.2d 1185, 1187 (7th Cir.1991) (emphasis added). Following the logic of the Fifth and Seventh Circuits, the proper comparison class for determining

whether the Arizona transaction privilege tax and use tax violate subsection (b)(4) of the 4–R Act is "all industrial and commercial taxpayers who are subject to the tax."

■ Moreover, the purpose of the 4–R Act was not to grant railroads preferential treatment. *CSX Transp., Inc. v. Tennessee State Bd. of Equalization,* 801 F.Supp. 28, 35–36 (M.D.Tenn.1992). Rather, in adopting the 4–R Act, Congress' purpose was to remedy discrimination against the railroads and place them on an even playing field with other state taxpayers. *Ogilvie v. State Bd. of Equalization,* 657 F.2d 204, 207 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981). This goal was reflected in the Association of American Railroads' proposed antidiscrimination tax bill which later served as the basis for the 4–R Act:

This proposed antidiscrimination tax bill, ... has the obvious merit of insuring that such carriers would receive equal treatment *with other taxpayers subject to the same tax rates* in accordance with applicable State law. The proposal in no way alters the freedom of the State to tax its taxpayers as in its discretion it deems best, so long as such carriers are *accorded equal tax treatment with other taxpayers.*

*Ogilvie,* 657 F.2d at 207 n. 3 (emphasis added) (quoting S.Rep. No. 445, 87th Cong., 1st Sess. 465–66 (1961)). *But cf. Burlington Northern R.R. Co. v. Triplett,* 682 F.Supp. 443, 446 (D.Minn.1988); *National R.R. Passenger Corp. v. State Bd. of Equalization of Cal.,* 652 F.Supp. 923, 926–27 (N.D.Cal.1986); *Burlington Northern R.R. Co. v. Commissioner of Revenue,* 509 N.W.2d 551, 553–54 (Minn.1993); *Atchison, Topeka & Santa Fe Ry. v. Bair,* 338 N.W.2d 338, 346 (Iowa 1983).

The comparison class of "commercial and industrial taxpayers subject to the tax" must be used in analyzing the Arizona tax scheme because a narrow comparison class, comprised only of "motor carriers," would result in preferential treatment for the railroads. In order for railroad carriers to receive equal treatment with other taxpayers subject to the same tax law, they must be compared to all others subject to the tax in question, not just compared to motor carriers. Although subsection (b)(4) is silent as to the proper

comparison class, congressional intent behind the 4–R Act dictates that the comparison class of "other commercial and industrial taxpayers subject to the tax" be used. *See ·Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987) (holding that in interpreting statutes, courts must not be guided by a single sentence, but must look to the provisions of the whole law and to its object and policy).

## C. *Discriminatory Taxation Analysis*

In claiming that the Arizona transaction privilege tax and use tax are discriminatory, the railroads make two arguments: 1) the Arizona transaction privilege tax and use tax exemption for motor carriers is discriminatory; and 2) the Arizona transaction privilege tax and use tax impose discriminatory rates upon the railroads. Both of these arguments lack merit.

■ First, the discriminatory exemption argument fails because the Supreme Court, in *Department of Revenue v. ACF Indus., Inc.,* —— U.S. ——, ——, 114 S.Ct. 843, 846, 127 L.Ed.2d 165 (1994), held that discrimination under the 4–R Act does not arise when exemptions are granted from a generally applicable property tax if the railroads are treated fairly in comparison to other industrial and commercial taxpayers subject to the tax. "[A] State may grant exemptions from a generally applicable ad valorem property tax without exposing the taxation of railroad property to invalidation under subsection (b)(4)." *Id.* at ——, 114 S.Ct. at 848. "It would be illogical to conclude that Congress, having allowed the States to grant property tax exemptions in subsections (b)(1)–(3), would turn around and nullify its own choice in subsection (b)(4)...." *Id.* at ——, 114 S.Ct. at 849. *See also, Burlington N. R.R. v. Wisconsin Dept. of Revenue,* 59 F.3d 55, 58 (7th Cir.1995) (holding that exempting eighty percent of non-railroad commercial and industrial property from a generally applicable ad valorem property tax did not violate the 4–R Act); *cf. Burlington N. R.R. v. Bair,* 60 F.3d 410, 413 (8th Cir.1995) (The court held that Iowa's real property tax violated subsection (b)(4) of the 4–R Act and did not fall within the exemption exception carved out in

*ACF* because the tax was not one of general applicability. The court determined that Iowa's real property tax was discriminatory because it singled out for taxation all personal property of the railroads, while leaving untaxed most of the personal property of the majority of commercial and industrial enterprises in the state.).

Although *ACF* specifically addressed property tax exemptions, the logic advanced by the Supreme Court is equally applicable to the context of transaction privilege tax and use tax exemptions. The Court in *ACF* reasoned that if Congress, as a condition of permitting the taxation of railroad property had intended to restrict state power to exempt non-railroad property, Congress would have done so with clarity and precision. *ACF*, —— U.S. at ——, 114 S.Ct. at 850. The Court further explained that in determining the breadth of a federal statute which impinges upon a State's traditional powers, courts should be hesitant to extend a statute beyond its evident scope. *Id.* Accordingly, if Congress, as a condition of permitting state taxation of the railroads through sales and use taxes had intended to restrict state power to exempt other types of businesses from these taxes, Congress would have done so explicitly. Therefore, because Congress did not explicitly prohibit states from carving out exemptions to their sales and use taxes, such exemptions are permissible.

■ The transaction privilege tax and use tax at issue in this case are generally applicable taxes. The transaction privilege tax is imposed upon seventeen classifications of business activities, including railroad activities, and encompasses over 140,000 industrial and commercial taxpayers. The Arizona use tax is imposed on all businesses in Arizona, irrespective of whether the business is additionally subject to the transaction privilege tax. The number of businesses subject to the use tax is so large that the Taxing Authorities cannot provide an exact number. However, they are confident that the number exceeds the 140,000 taxpayers subject to the transaction privilege tax.

Following the logic advanced by the Supreme Court in *ACF*, the Arizona transaction privilege tax and use tax do not violate the 4-R Act merely because they provide an exemption for motor carriers. The Arizona transaction privilege tax and use tax are taxes of general applicability, and therefore, the exemptions for motor carriers are permissible under the 4-R Act. Furthermore, the transaction privilege tax and use tax exemptions for motor carriers do not entirely exempt motor carriers from taxation because motor carriers are taxed under a separate tax scheme.

■ The second argument advanced by the railroads is that the Arizona tax scheme is discriminatory because the railroads are subjected to discriminatory tax rates. This argument fails as well. The tax rate imposed on the railroads is equivalent to that imposed on the vast majority of other commercial and industrial taxpayers. The transaction privilege tax rate of five percent applies to fourteen of the seventeen classifications of businesses subject to the tax. Those fourteen classifications comprise approximately seventy-nine percent of the total transaction privilege tax collected by the State of Arizona.

■ Lastly, the railroads argue that the Arizona tax scheme is discriminatory because the revenue collected from motor carrier taxes is used to repair the roads, while the railroads must repair trackage themselves. This argument is without merit. The Arizona Constitution allows taxes to be "levied and collected for public purposes only." Ariz. Const. art. 9, § 1 (1984) (Ariz.Rev.Stat. Ann.). *See City of Phoenix v. Michael*, 61 Ariz. 238, 239, 148 P.2d 353, 354 (1944) (holding that a city may not expend public money except for public purposes, and then only when directly or impliedly authorized to do so). The State of Arizona cannot levy and collect taxes to construct and maintain trackage on privately owned railroad property. The 4-R Act reaches only tax burdens and not tax benefits.

In sum, the railroads have not been singled out for discriminatory taxation through either the use of discriminatory tax exemptions or through excessive tax rates. According to *ACF*, discrimination under the 4-R Act does not arise when exemptions are granted from a generally applicable tax if the railroads are

treated fairly in comparison to other commercial and industrial taxpayers subject to the tax. The Arizona transaction privilege tax and use tax exemptions for motor carriers do not violate the 4–R Act because the taxes at issue are generally applicable and because the railroads are treated fairly in comparison to other taxpayers subject to the Arizona taxes. The tax rates imposed by Arizona are also not discriminatory. The railroads pay the same tax rate as fourteen of the seventeen classifications subject to the transaction privilege tax.

### III. *Conclusion*

The district court's grant of summary judgment for the plaintiffs is REVERSED. The district court's grant of a permanent injunction for the plaintiffs is REVERSED. We REMAND and direct the district court to grant summary judgment in favor of the defendants.

WM. FREMMING NIELSEN, District Judge, dissenting:

I concur with the Court's holding in respect to Section II A. However, I respectfully dissent because the majority utilizes an inappropriate comparison class in determining whether this tax exemption results in discrimination against the Railroads. I would AFFIRM the district court's holding that the correct comparison group is the Railroads' competitors, and that the tax discriminates against the Railroads.

I believe that using the competitor comparison class in this case serves the purpose of (1) harmonizing what appears to be a conflict amongst the courts regarding the appropriate comparison class under 306(1)(d); (2) making statutory sense of 306(1) which provides a specific comparison class in three of four subsections, but pointedly omits any reference to a comparison class in the subsection at issue here; (3) upholding the purposes of the 4–R Act in avoiding adverse competitive effects against the railroads; and (4) avoiding the patently discriminatory effects of this tax.

### I.

The majority cites two cases supporting the broad comparison group, *Burlington Northern R.R. Co. v. City of Superior*, 932 F.2d 1185, 1187 (7th Cir.1991); *Kansas City So. Ry. v. McNamara*, 817 F.2d 368, 376 (5th Cir.1987), but does not address the three courts that adopt the competitor comparison class. *Burlington Northern R.R. Co. v. Triplett*, 682 F.Supp. 443, 446 (D.Minn.1988); *Burlington Northern R.R. Co. v. Commissioner of Revenue*, 509 N.W.2d 551, 553–54 (Minn.1993); *Atchison, Topeka & Santa Fe Ry. v. Bair*, 338 N.W.2d 338, 346 (Iowa 1983). The majority makes no attempt to reconcile these cases. I believe that a harmonization of these seemingly opposite cases is not only possible, but necessary to make sense of the statute. An examination of the cases considering this issue suggests that tax discrimination under 306(1)(d) of the 4–R Act has been rejected in two distinct situations, which necessarily dictate different comparison classes.

Two Circuits embraced the "other commercial and industrial taxpayer" comparative class under 306(1)(d) when railroads were essentially singled out for taxation, *Burlington Northern R.R. Co. v. City of Superior*, 932 F.2d at 1187, or the class of taxpayers burdened by the tax was "unnecessarily small." *McNamara*, 817 F.2d at 376. In these situations, the appropriate comparison class is composed of general commercial and industrial taxpayers subject to the tax because the essence of the railroads' claim is that the railroads are singled out of that class for differential treatment.

This case, however, involves a broad tax that exempts the Railroads' primary competitors. The majority's reliance on *McNamara* and *Burlington Northern v. City of Superior* is misplaced because neither case addresses this form of discriminatory taxation. *Burlington Northern R.R. Co. v. Commissioner of Revenue*, 509 N.W.2d at 553. The use of the "other commercial and industrial taxpayer" class in this setting is ineffectual because it allows precisely the type of discriminatory tax at issue here. Indeed, the majority does not cite to a single case upholding a general tax that includes a railroad, but excludes the railroad's primary competitors. Such a case

does not exist because the discriminatory results are obvious. In this type of situation, then, the appropriate comparison class must be the railroad's competitors.

## II.

Two comparison groups may be utilized under subsection (d) because that subsection does not require that a specific comparison group be adopted. This is in marked contrast to subsections (a), (b), and (c) which require that commercial and industrial taxpayers be used as the comparison class. Indeed, the Ninth Circuit previously noted this omission in subsection (d):

> [S]ections 3061(a) and (c), ... restrict the comparison classes to "other commercial and industrial property." There is no analogous restriction in the broad language of section 3061(d).

*ACF Indus., Inc. v. Department of Revenue*, 961 F.2d 813, 821 (9th Cir.1992) *rev'd on other grounds*, —— U.S. ——, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994).

The majority glosses over this statutory construction problem by arguing that Congressional intent "dictates" the broad comparison class be used under subsection (d). Putting aside the question of Congressional intent for a moment, this does not explain why Congress specifically chose to omit any reference to a comparison class in subsection (d), yet utilized the "other commercial and industrial" taxpayer group in subsections (a), (b), and (c). I believe a more careful analysis of the statutory construction issue is necessary in order to help discern Congressional intent.

The Supreme Court has addressed the issue of statutory omissions. *Federal Trade Comm'n v. Sun Oil Co.*, 371 U.S. 505, 513–515, 83 S.Ct. 358, 363–364, 9 L.Ed.2d 466 (1963). In *Sun Oil Company*, the Court considered two subsections of a statute, the second part of which omitted a detailed description of "competition" that existed in subsection (a). *Id.* The Court refused to construe subsection (b) as having the same definition, holding that "(t)here is no reason appearing on the face of the statute to assume that Congress intended to invoke by omission in 2(b) the same broad meaning of competition or competitor which it explicitly provided by inclusion in 2(a); **the reasonable inference is quite the contrary.**" *Id.* at 515, 83 S.Ct. at 365 (emphasis added).

Therefore, I proceed with the assumption that the omission of a comparison class in 306(1)(d) is not coincidental. If Congress wanted that subsection to share the same broad comparison class as the three preceding subsections, and none other, it would have said so. It did not. *Sun Oil Co.*, 371 U.S. at 514–515, 83 S.Ct. at 364 ("[S]ince Congress expressly demonstrated in the immediately preceding provision of the Act that it knew how to expand the applicable concept of competition ... it is reasonable to conclude that like clarity of expression would be present in 2(b)....") I refuse to provide for an exclusive comparison class under 306(1)(d) when Congress explicitly chose not to do so. Finding that 306(1)(d) only permits the broad comparison class does not interpret the 4–R Act, but amends it. *Fedorenko v. United States*, 449 U.S. 490, 513, 101 S.Ct. 737, 750, 66 L.Ed.2d 686 (1981) (citing *Sun Oil Co.*, 371 U.S. at 514–515, 83 S.Ct. at 364–365).

## III.

"The purpose of the 4–R Act was to prevent tax discrimination against railroads **in any form whatsoever.**" *Ogilvie v. State Board of Equalization*, 657 F.2d 204, 210 (8th Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981) (emphasis added). The rationale for the Act is the concern that railroads " 'are easy prey for states and local tax assessors in that they are non-voting, often non-resident, targets for local taxation, who cannot easily remove themselves from the locality.' " *Id.* (citations omitted).

The broad comparison group defeats the purpose of the 4–R Act by placing the Railroads at a decided competitive disadvantage. *Burlington Northern R.R. v. Commissioner of Revenue*, 509 N.W.2d at 553 (comparison class "is in keeping with the purpose of the 4–R Act: to revitalize the railroad industry by making it competitive"); *Triplett*, 682 F.Supp. at 446. Where the majority sees "preferential treatment" for the Railroads, I

see a tax that hinders the Railroads' ability to compete fairly with its competitors. I do not object to the Railroads paying their fair share of the tax burden. I do object, however, to the payment of discriminatory taxes which place the Railroads at a decided competitive disadvantage.

## IV.

The weakness of the exclusive use of the broad comparison class becomes evident in a case like this. The transaction privilege tax reaches over 140,000 transaction privilege tax licenses issued statewide. There is one exception. That exception, of course, is for motor carriers who represent the principal competitors of the Railroads. As the Fourth Circuit noted, "in essence, discrimination is a failure to treat all persons equally where no reasonable distinction can be found between those favored and those not favored." *Richmond, Fredericksburg & Potomac R.R. v. Department of Taxation*, 762 F.2d 375, 380 n. 4 (4th Cir.1985). I fail to find such a distinction in the case before us.

The broad comparison class overlooks the obvious point that a tax imposed on rail carriers, but not on motor carriers, is discriminatory in the most basic sense of the word—it treats those engaged in an identical activity differently. In this instance, it treats those involved in the transportation of goods or passengers differently, and the Railroads suffer a dramatic competitive disadvantage. This is a result the 4–R Act cannot allow.

The disparate tax treatment of the Railroads with motor carriers, their principal competitor, is discriminatory. This disparate treatment is, in my view, unlawful under the 4–R Act. Accordingly, I DISSENT.